860 A.2d 450 (2004)
372 N.J. Super. 578
In re Authorization for FRESHWATER WETLANDS GENERAL PERMITS, Water Quality Certification and Waiver of Transition Area for Access.
Superior Court of New Jersey, Appellate Division.
Submitted November 4, 2004.
Decided November 16, 2004.
*451 Rutgers Environmental Law Clinic, for appellant Preserve Old Northfield (Judith Weinstock, on the brief).
Peter C. Harvey, Attorney General, for respondent New Jersey Department of Environmental Protection (Patrick DeAlmeida, Deputy Attorney General, of counsel; Lisa A. Runyon, Deputy Attorney General, on the brief).
Lum, Danzis, Drasco & Positan, Roseland, for amicus curiae Township of Livingston (Dennis J. Drasco, of counsel and on the brief; Kevin J. O'Connor, on the brief).
Before Judges CONLEY, BRAITHWAITE and LISA.
The opinion of the court is delivered by
CONLEY, P.J.A.D.
Appellant, Preserve Old Northfield (POND), challenges a Letter of Interpretation (LOI) and a Freshwater Wetlands General Permit No. 6 (GP6) issued by the New Jersey Department of Environmental Protection (DEP) for activities near or adjacent to the properties of POND's members.[1] The LOI and the permit were issued on the basis of DEP's conclusion that the wetlands on the property were "isolated wetlands" within the meaning of N.J.S.A. 13:9B-7(b). Appellant contends, to the contrary, that the credible evidence in the record shows that the property consists of numerous wetlands which are part of an inland tributary system and therefore not isolated and that, therefore, the issuance of the permit was violative of the governing provision of the Freshwater Wetlands Protection Act. It also contends that DEP did not set forth the required findings of fact as to why it found the wetlands isolated and, that, indeed, the record contains insufficient data to support such findings. We agree that the necessary findings of facts are absent from both the LOI and the GP6 and remand for further proceedings. We do not address the sufficiency of the record argument as it is impossible to do so without specific factual findings by DEP.
*452 The LOI and GP6 permit were issued by DEP after a long and arduous process, entailing submission of voluminous correspondence and evidentiary materials, including a number of expert reports and videotapes, submitted by the objectors, several site investigations by DEP and a meeting between DEP and interested persons. The process began in February 2001, when Daniel Markowitz of Maramark Builders, L.L.C. (Markowitz), submitted an application to DEP seeking DEP authorization to fill 0.19 acres of freshwater wetlands in connection with construction of a roadway, a cul-de-sac, and an eleven-single-family-residential-home development on a site located on West Hobart Gap Road in Livingston Township, Essex County. A portion of a DEP 1986 Freshwater Wetlands map (located in the record at Aa163) shows significant wetlands on the property. The depiction of these wetlands on the map suggests interconnection with wetlands coursing throughout the area.
LOI's are letters issued by DEP to applicants in order to establish whether the site of the proposed activity is located in or adjacent to a freshwater wetland or transition area. These letters: (1) identify the presence or absence of wetlands, State open waters, or transition areas; (2) verify or delineate the boundaries; or (3) assign a wetland a resource value classification. N.J.S.A. 13:9B-8; N.J.A.C. 7:7A-1.4. A LOI, however, "does not grant approval [to the applicant] to conduct any regulated activities. The sole function of [a LOI] is to provide or confirm information about the presence or absence, boundaries, and/or resource value classification of freshwater wetlands, transition areas and/or State open waters." N.J.A.C. 7:7A-3.1(b). It is through the permitting process that one may obtain authorization to disturb wetlands. N.J.S.A. 13:9B-3, -9(a), -23.
The Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, defines a freshwater wetland as
[A]n area that is inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation....
[N.J.S.A. 13:9B-3.]
Further:
[t]he department, in designating a wetland, shall use the 3-parameter approach (i.e. hydrology, soils and vegetation) enumerated in the April 1, 1987 interim-final draft "Wetland Identification and Delineation Manual" developed by the United States Environmental Protection Agency and any subsequent amendments thereto....
[Ibid.]
The regulations adopted pursuant to the FWPA likewise state that the designation of freshwater wetlands shall be based upon the three-parameter approach: hydrology, soils and vegetation. N.J.A.C. 7:7A-2.3(a).
The FWPA sets forth three classifications of wetlands: exceptional resource value, intermediate resource value and ordinary resource value. N.J.S.A. 13:9B-7. Freshwater wetlands of "exceptional value" are defined as wetlands that "discharge into ... trout production waters and their tributaries" or provide "habitats for threatened or endangered species." N.J.S.A. 13:9B-7(a). Freshwater wetlands of "ordinary value" are defined as wetlands that "do not exhibit the characteristics [for wetlands of exceptional resource value] and which are certain isolated wetlands, man-made drainage ditches, swales, or detention facilities." N.J.S.A. 13:9B-7(b). Freshwater wetlands of intermediate *453 resource value are all freshwater water wetlands which are neither of exceptional resource value nor of ordinary value. N.J.S.A. 13:9B-7(c). Only freshwater wetlands classified as exceptional resource value or intermediate resource value require adjacent transition areas for construction purposes. N.J.S.A. 13:9B-16(a).
As we have said, a person proposing to engage in a regulated activity in a freshwater wetland must apply to DEP for a permit. N.J.S.A. 13:9B-3, -9(a) and -23. Here, a general permit was sought.[2] DEP's issuance of general permits is specifically governed by N.J.S.A. 13:9B-23(b). It provides:
The department shall issue a general permit for an activity in a freshwater wetland which is not a surface water tributary system discharging into an inland lake or pond, or a river or stream, and which would not result in the loss or substantial modification of more than one acre of freshwater wetland, provided that this activity will not take place in a freshwater wetland of exceptional resource value.... The provisions of this subsection shall not apply to any wetlands designated as priority wetlands by the United States Environmental Protection Agency.
[Emphasis added.]
Thus, the applicant must establish (1) that the wetlands are not part of a surface water tributary system discharging into a lake, pond, river or stream, (2) that the proposed disturbance of the wetlands does not affect more than an acre, and (3) that wetlands of exceptional value are not involved. It is the first criteria that is the focus of this appeal.
A GP6 for "non-tributary wetlands" is codified at N.J.A.C. 7:7A-5.6(a). It "is the isolated wetlands general permit required by DEP pursuant to N.J.S.A. 13:9B-23b." In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488, 852 A.2d 1083, 1089 (2004). A GP6 "authorizes regulated activities in freshwater wetlands, transition areas adjacent to those wetlands, and/or State open waters, if the freshwater wetlands and/or State open waters are not part of a surface water tributary system discharging into an inland lake or pond, or a river or stream." N.J.A.C. 7:7A-5.6(a).
Wetlands are "[p]art of a surface water tributary system" if:
[C]onnected to a surface water[3] that discharges into a lake, pond, river, stream or other surface water feature. The connection may be through any surface water feature, whether regulated or not, including a stormwater or drainage pipe. The connection may be through a secondary flow channel or other feature. However, the connection may be through overland flow only if there is evidence of scouring, erosion, or concentrated flows. The connection may not be through groundwater alone. Wetlands adjacent to a surface water are connected to the surface water and are part of the surface water tributary system.
[N.J.A.C. 7:7A-1.4 (emphasis added).]
The property at issue consists of three lots shaped like a large isosceles triangle, *454 with the base of the triangle abutting West Hobart Gap Road. It is surrounded by extensive residential development. It contains a number of wetlands. In his application, Markowitz identified the property as "seven (7) wooded acres." He described the property as containing two "isolated" wetlands (totaling 0.19 acres) that were not classified as EPA Priority Wetlands, and further noted that "[h]istorical land disturbance activities of unknown time and origin has [sic] resulted in extensive alteration of pre-existing contours and soil profiles."[4]
At the time of his application to DEP, Markowitz sent notice thereof to the neighboring property owners and others, as then required by N.J.A.C. 7:7A-9.5(b) (recodified as N.J.A.C. 7:7A-10.9, effective Aug. 3, 2001, see 33 N.J.R. 3045 (Sept. 4, 2001)). The notice stated:
The Department welcomes comments and any information that you may provide concerning the presence of wetlands, open water or transition areas on the referenced parcel. Written comments should be submitted within 15 days of receiving this letter. Comments will be accepted until the Department makes a decision on the application.
The onslaught of evidential material submitted to DEP in opposition to the application began in February 2001 and continued through to February 2002. DEP received numerous letters and a petition from members of appellant and other adjacent property owners objecting to the permits because they were concerned about flooding and stormwater runoff. The letters described in detail long-term wet conditions that existed in the area, with sheeting or flowing of water from the subject property, and asserted that the property was hydrologically connected to a swale and ditch system carrying runoff from the site and its wetlands to a nearby stream. If true, the wetlands could not be categorized as "isolated." Videos of the conditions taken from the neighboring properties were also submitted.
In addition to the material, POND hired an engineering expert, Thonet Associates, Inc. (Thonet). Thonet submitted an initial report to DEP in May 2001. That report evaluated the property's wetlands and was based on Thonet's visit of the surrounding area on March 22, 2001, conversations with neighboring property owners, Markowitz's application, and a review of public information on wetlands and floodplains on or in the vicinity of the site.
According to this report, the wetlands on the property drained into "a blue-line stream" southwest of the site via on-site swales and a stormwater catch basin located west of the site. There was evidence of past disturbances, including construction of ditches and other artificial drainage features that had been installed to help in drainage. In addition, it was reported that many of the trees had "shallow root systems, a morphological adaptation and common hydrologic indicator of wetlands." There were "numerous ponded areas with standing water up to six inches deep, indicative of saturated soils and wetlands hydrology." The report states: "[E]xcept for piles of rocks and fill, it was hard to find a dry spot anywhere on the site." "[N]umerous connections from the wetlands to the swales and from the swales to a surface water tributary system" were observed. The report concludes: (1) that the extent of the property's wetlands were *455 "far greater than depicted by" Markowitz's application and "more closely resemble[d] the wetlands shown on the [1986] NJDEP Freshwater Wetlands Map"; (2) that the wetlands did "in fact connect to a surface tributary system, the swales, discharging into a surface water feature ... and therefore the wetlands on this site are not isolated"; and (3) that the wetlands "may" provide critical habitat for threatened and endangered species.
On June 8, and August 20, 2001, DEP conducted on-site inspections of the property. The field notes by Christopher Jones, Section Chief of DEP's Bureau of Inland Regulations, of the June 8 site inspection, as best we can decipher, reflect the following:
Site inspection with Robert Piel.
We parked in the driveway by the garage. We then inspected the yard drain by flag WD1-1. We then proceeded to the drainage swale by flag S-7A.
Numerous soil borings were taken throughout the site. Below are 3 representative samples.
1. Soil boring 1 taken between flag WD1-2F and WD1-8. Atypical conditions  lawn area
0-8" 10yr4/4 fill material
8" + 10yr3/1 with 10y3/4 Redox no hydrology indicators found no oxidized root channels
grass dominates with white clover common and plantain.
2. Soil boring 2 taken in woods at edge of tree line  upland of WD1-3F
0-12" polychromatic 10yr3/2 and 10yr5/4 dominant colors
Red maple, poison ivy, Virginia creeper.
3. Soil boring 3 taken in rear of site in the "triangle" portion of site
0-12" 10yr5/3
Black cherry saplings
White Oak
Red Oak
Norway Maple
We then proceeded along the eastern property boundary and took more borings in the vicinity of area between WD8-B and WD-3B soils were brown in color trees included Red Oak, White Oak, Shagbark hickory.
Finally, we ended by looking at the upland area by WD1-11 and observed that the upland side had been filled thus there were no drainage pathways or wetlands between WD1-6-WD1-5A-WD1-11 (line defined by these 3 points) and the other isolated wetlands
On the second inspection, Jones found:
Several isolated [wetland] areas on site  no surface water connection
WD1-1 to WD1-8 is a swale area connected to off site swale via drain inlets.
In the swale area, Jones observed "hydrology present, drainage patterns in the lawn area." Finally, he noted the presence of various trees and ground cover throughout the property.
As a result of the on-site inspections, Markowitz submitted a revised wetlands map that included enlargement of the two delineated wetlands in the original application and the addition of other wetlands and swale areas. In all, Markowitz identified four isolated wetlands on the property which totaled 0.52 acre.
The LOI was issued on August 30, 2001. Based upon the "information submitted" and the June 8 and August 20, 2001 on-site inspections, Markowitz' revised map was found to be "accurate as shown." Further Markowitz was advised:
In addition, the Department has determined that the wetlands on the subject property are of intermediate and ordinary resource value. Field points *456 WD1-A to WD6-A; WD1-B to WD8-B; WD-1H to WD-5H to WD5B to WD4B and WD1-1F to WD1-3F to WD-1A to WD-5 are isolated wetlands of intermediate resource value and the standard transition area or buffer required adjacent to these wetlands is 50 feet. Field points WD1-1 to WD1-11 and then to WD1-8 is a swale of ordinary resource value and Field points S-11A to S-8A to S-1A and then to 5-2 is a ditch of ordinary resource value. There is no buffer or transition area associated with ordinary resource value wetlands. In addition, the ditches/swales have also been identified as being priority wetlands by the U.S. Environmental Protection Agency. This classification may affect the requirements for an Individual Wetlands Permit (see N.J.A.C. 7:7A-3), the types of Statewide General Permits available for the wetlands portion of this property (see N.J.A.C. 7:7A-9) and the modification available through a transition area waiver (see N.J.A.C. 7:7A-7). Please refer to the Freshwater Wetlands Protection Act (N.J.S.A. 13:9B-1 et seq.) and implementing rules for additional information.
It should be noted that this determination of wetlands classification is based on the best information presently available to the Department. The classification is subject to change if this information is no longer accurate, or as additional information is made available to the Department, including, but not limited to, information supplied by the applicant.
This letter in no way legalizes any fill which may have been placed, or other regulated activities which may have occurred on-site. Also this determination does not affect your responsibility to obtain any local, State or Federal permits which may be required.
Thus, DEP identified that there were certain wetlands and a ditch[5] and a swale[6] on the property. It classified those as follows: (1) the wetlands were found to be isolated; (2) the swale and ditch were found to be "ordinary resource value", and (3) the swale and ditch were identified as "being priority wetlands by the U.S. Environmental Protection Agency."
Thereafter, the neighbors unsuccessfully requested an adjudicatory hearing.[7] And, too, Thonet submitted an additional report in December 2001. The report reiterates the findings in the May 2001 report and the conclusion that the wetlands on the property as not isolated but, rather, a part of a surface water system. In addition, *457 the second report notes that, since its last report, Markowitz had enlarged and re-delineated the wetlands areas on the property but ignored the hydrologic connection between the wetlands, swale and a drainage system on and off the property. The report also, again, refers to DEP's own 1986 Freshwater Wetlands Map which seems to depict the site's wetlands as continuously connected to an off-site system. See footnote 3, supra. The report concludes that "water from the site's wetlands areas flows directly to the swale system" which discharges to a drain inlet and a nearby stream. Thus:
[I]f the site's wetlands are filled, the stormwater that is currently captured and temporarily stored by those wetlands would be no longer captured and stored and this loss of flood storage would result in increased ponding and flooding on the properties of the objecting neighbors.
The report also observed deficiencies in Markowitz's application process.
In February 2002, Markowitz submitted a revised application for a GP6. Markowitz's amendments included the four isolated wetlands of intermediate value that had been identified, totaling 0.52 acres. He also stated that all of the isolated wetlands were located "in headwater areas," and that they were not EPA priority wetlands because of their isolated nature.
In April 2002, appellant and neighboring property owners submitted more letters and a petition objecting to Markowitz's revised application for a GP6. Thonet also submitted another report to DEP in April 2002. That report asked that DEP address the following issues in its investigation. First, whether a newly designated swale on Markowitz's revised wetlands map was not a swale as defined by N.J.A.C. 7:7A-1.4 but rather "a low-lying, poorly drained wetland depression in which an inlet was constructed to eliminate the ponding condition that exits there." Second, the report describes the existence of additional wetlands, including some recently filled wetlands, within seventy feet from that "so-called swale," and which had not been delineated on Markowitz's approved wetlands map. Third, the report asked DEP to investigate previous historical land disturbances that altered soil profiles and drainage patterns, noting that historical land disturbances required special methodologies to delineate wetland areas which Markowitz had not followed even after acknowledging the disturbances. Fourth, the report points out that Markowitz had failed to provide any hydric soil samples or breakdowns of dominant vegetation on the entire property by location. This information would be the "next best indicator of wetland conditions" on a site that has been filled and disturbed. In this respect, the report recounts observations from the periphery of the property (because Thonet had no permission to enter the property) that the dominant species of vegetation were hydrophytes. Finally, the report asked DEP to again examine whether the wetlands on the property were isolated or were connected by an on-site swale system to the nearby stream.
The record also contains an extensive June 25, 2002, letter from Thonet to appellant's counsel, obviously prepared in connection with Markowitz's preliminary subdivision application before the Livingston Planning Board. In it, Thonet again disagreed with Markowitz's assertion that the wetlands were isolated; rather, "[t]he site is covered with evidence of scouring, erosion and concentrated flow paths leading to the site's swale system and ultimately to a drainage system leading to a nearby stream." Thonet asserted that based on its own inspection from the property's perimeter, numerous follow-up visits to document *458 ponding conditions in the area, and a review of Markowitz' plans, it found that 2.5 acres of off-site drainage currently flowed across the site into the existing wetlands and swale system located along the property's western-most property line, and then into a drainage inlet and into the township's drainage pipes leading to a stream. Thonet also disagreed with the extent of wetlands shown on Markowitz's plans. It found that based on its field observations and discussions with neighboring owners, about 20% of the property ponds water during and after heavy storms with these wet conditions occurring "constantly throughout the spring." By way of example, Thonet reported that it had observed the property (albeit off-site) one week after a June storm and, although the ponding had disappeared, the site was "clearly saturated" where ponding had existed. In fact, Thonet found that "more than half of the site exhibits vegetation that is predominately hydrophytic (wetland) in character."
Apparently this report was sent to DEP as, in a July 25, 2002, letter from Christopher Jones, DEP responded as follows. Although Jones acknowledged that "overland flow out of an isolated wetland can and will occur," he pointed to the absence of any observations during DEP's on-site investigations of scouring, erosion or concentrated flow. See N.J.A.C. 7:7A-1.4. And he found no such conditions reflected in the photographs that had been submitted by Thonet in May 2001 and June 2002. As to Thonet's opinions that there were more unidentified wetlands on the property and that the property was 20% wetlands, Jones pointed out that Thonet had not provided any mandatory data supporting those opinions as would be required by the Federal Manual For Identifying and Delineating Jurisdictional Wetlands, 1989 (Federal Manual).
Jones assured that "[b]ecause of the strong concern expressed by adjacent property owners, [DEP] has scrutinized this site far more than is customary for the review of a Letter of Interpretation." He explained that DEP's staff had inspected the site three times; "[t]wo of the inspections included a supervisory level staff member, while one inspection included the Manager of the Bureau of Inland Regulations." He concluded by stating:
It is the position of the Department that the wetlands were evaluated using the appropriate scientific methodologies as enumerated in the Federal Manual for Identifying and Delineating Jurisdictional Wetlands, 1989, and that we applied the proper use of the Freshwater Wetlands Protection Act Rules when classifying the wetlands. Finally, the suitability of the wetland for threatened or endangered species habitat was considered using the established Department protocols.
In a letter to appellants' attorney dated September 9, 2002, Thonet replied to Jones' July 25, 2002, letter. He pointed out that Jones had acknowledged that the property's wetlands would be overtopped by stormwater flows during some storms, yet had not conducted any on-site investigations during the rainy months. And he observed: "These flows are best observed in the Spring season during heavy rainfalls. In Summer and Fall, or during drought conditions such as we've been experiencing, the water table is generally low and the site acts as an effective sponge, for rainfall with very little stormwater runoff produced." And, too, in August and September 2002, several neighboring property owners wrote more letters to DEP expressing concern over the current and anticipated increase in future flooding if the wetlands were filled on the property. They described the water observed flowing *459 from the property by using phrases such as "a stream that forms, moving in a clear channel, which had been formed by erosion and scouring," "running water through-channels," and "river-like flows of water." In one letter, recent buyers of nearby property wrote that they had observed "on at least two occasions ... flows of water running from an area flagged as a wetland across the ground in a shallow concentrated fashion, with scouring and erosion, during and after moderate to heavy rainfalls."
Objections from other sources also were submitted. In a letter dated January 15, 2002, John F. McKeon, Assemblyman of the Twenty-Seventh District and Mayor of West Orange, asked DEP to conduct a more complete study of the property. In a letter to DEP dated July 1, 2002, the Association of New Jersey Environmental Commission declared that the wetlands on the property were not isolated, asserting:
The state's definition of "isolated wetland" does NOT include a requirement that the surface water connection be present all the time. In fact, some of our most valuable wetlands exist at the very source of our streams and are only connected to them during the spring and/or during heavy precipitation events. Loss of these wetlands will impact the quality of the water in these headwater streams, streams that are often intermittent, but that are critical to delivering high water quality to the larger water bodies down stream.
Additionally, the Livingston Environmental Commission submitted a letter to DEP regarding Markowitz's application. The Commission noted that DEP's 1986 Freshwater Wetlands Map, historical municipal maps, and comments from the neighbors indicated that the property consisted largely of wetlands. The Commission recognized that historical descriptions might not match current regulatory definitions, but it was concerned because it was working on the township's Open Space Inventory. Thus, the Commission asked DEP for guidance on how to determine which wetlands-delineation report was accurate. The Commission further suggested that DEP "hold a hearing to listen to and evaluate the contrary information about the status of the wetlands to be filled."
In November 2002, DEP met with members of POND, their attorney, Thonet, and other interested persons. Apparently during that meeting DEP officials described what the neighbors and Thonet observed vis-a-vis runoff from the property as a "sheet flow." Markowitz thereafter submitted a revised application correcting the lot and block numbers and adding additional wetlands of 0.064 acre, DEP required Markowitz to re-notify interested parties about the amended application, and agreed to accept additional public comments.
Thonet, then, filed more exhibits  photographs, maps, and another report  again supporting its assertion that the wetlands were not isolated. DEP also received additional letters and videotapes from neighboring landowners. The neighbors had filmed their properties during and after various rainfalls. The videos depict the resulting wet conditions and clearly show water coming from the subject property and flowing along what seems to be a drainage system.
The GP6 was issued on May 6, 2003. It contains no findings of facts or analysis of the materials submitted by the objectors. It concludes only that the wetlands are "isolated" by permitting a disturbance of 0.58 acres of "isolated intermediate resource value wetlands" for the construction of the proposed subdivision.
*460 We begin with the acknowledgement of the limited nature of our scope of review. E.g., In re Freshwater Wetlands Act Rules, supra, 180 N.J. at 488-89, 852 A.2d at 1089-90; In re Dist. of Liquid Assets, 168 N.J. 1, 10-11, 773 A.2d 6, 11-12 (2001). The fundamental consideration "is that a court may not substitute its judgment for the expertise of an agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable [or not supported by the record]." Id. at 10, 773 A.2d at 12. In exercising those review powers, we traditionally defer to an agency's expertise in cases involving technical matters within the agency's special competence. E.g., In re Freshwater Wetlands Act Rules, supra, 180 N.J. at 489, 852 A.2d at 1090. This deference is even stronger when the agency, like DEP in regard to wetlands, "has been delegated discretion to determine the specialized and technical procedures for its tasks." Newark v. Natural Res. Council, Dep't of Envtl. Prot., 82 N.J. 530, 540, 414 A.2d 1304, 1309 cert. denied, 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1980). This is because the agency has the "staff, resources and expertise to understand and solve those specialized problems." Bergen Pines County Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 474, 476 A.2d 784, 793 (1984); Schwerman Trucking Co. v. Dep't of Envtl. Prot., 125 N.J.Super. 14, 18-19, 308 A.2d 353, 355 (App.Div.1973). And, too, we do not reverse an agency's determination "because of doubt as to its wisdom or because the record may support more than one result." In re N.J. Pinelands Comm'n Resolution, 356 N.J.Super. 363, 372, 812 A.2d 1113, 1118 (App.Div.), certif. denied, 176 N.J. 281, 822 A.2d 610 (2003). Accord N.J. Dep't of Envtl. Prot. & Energy v. Occidental Chem. Corp., 288 N.J.Super. 458, 463, 672 A.2d 1167, 1169 (App.Div.1995).
The scope of our review of an agency decision, moreover, is also affected by whether the agency is exercising its rule-making authority or adjudicatory authority. In re Issuance of a Permit, 120 N.J. 164, 170-72, 576 A.2d 784, 787-88 (1990). DEP's permitting process is neither strictly rule-making nor strictly adjudicatory. Id. at 171, 576 A.2d at 787. Nonetheless, the Court has held:
The agency's decision to grant or deny renewal undoubtedly "requir[ed] the exercise of a discretion or judgment judicial in nature...." McFeely v. Board of Pension Comm'rs, 1 N.J. 212, 216, 62 A.2d 686[, 688] (1948). Moreover, the agency's final determination constitutes an "administrative adjudication," see N.J.S.A. 52:14B-2(c), which affords a permittee the opportunity to contest that decision at a hearing. See N.J.S.A. 58:10A-7d. Under those circumstances, the NJPDES renewal process is best classified as a quasi-judicial procedure possessing some, but not all, of the elements of a traditional adjudicatory proceeding. See, e.g., Juzek v. Hackensack Water Co., 48 N.J. 302, 225 A.2d 335 (1966) (holding that Water Policy and Supply Council of Department of Conservation and Economic Development performs quasi-judicial function in granting water utility permission to exercise power of condemnation); Adolph v. Elastic Stop Nut Corp. of Am., 18 N.J.Super. 543, 87 A.2d 736 (App.Div.1952) (finding that Employment Board of Review performs quasi-judicial function when reviewing and reopening employment application); Barton Contracting Co., Inc. v. City of Afton, 268 N.W.2d 712 (Minn.1978) (city council acts in quasi-judicial capacity when considering application for special-use permit); State ex rel. McNary v. Hais, 670 S.W.2d 494, 496 (Mo.1984) (en banc) *461 (county council's issuance of conditional-use permit was quasi-judicial decision).
Fact-finding is a basic requirement imposed on agencies that act in a quasi-judicial capacity:
It is axiomatic in this State by this time that an administrative agency acting quasi-judicially must set forth basic findings of fact, supported by the evidence and supporting the ultimate conclusions and final determination, for the salutary purpose of informing the interested parties and any reviewing tribunal of the basis on which the final decision was reached so that it may be readily determined whether the result is sufficiently and soundly grounded or derives from arbitrary, capricious or extra-legal considerations. [In re Application of Howard Savings Inst., 32 N.J. 29, 52, 159 A.2d 113[, 125] (1960) (citations omitted).]
An agency must engage in fact-finding to the extent required by statute or regulation, and provide notice of those facts to all interested parties. This requirement is "far from a technicality and is a matter of substance." New Jersey Bell Tel. Co. v. Communications Workers of Am., 5 N.J. 354, 375, 75 A.2d 721[, 731] (1950). In addition, fact-finding ensures that agencies act within the scope of their delegated authority, Mackler v. Board of Educ., City of Camden, 16 N.J. 362, 370, 108 A.2d 854[, 858] (1954) (citation omitted), and also facilitates appellate review:
[N]o matter how great a deference the court is obliged to accord the administrative determination which it is being called upon to review, it has no capacity to review at all unless there is some kind of reasonable factual record developed by the administrative agency and the agency has stated its reasons grounded in that record for its action. [State v. Atley, 157 N.J.Super. 157, 163, 384 A.2d 851[, 854] (App.Div.1978) (citations omitted).]
[Id. at 172-73, 576 A.2d at 788-89.]
In arguing in point I and parts of point II that DEP failed to conduct any fact-finding when it issued the LOI and GP6, appellant relies substantially upon In re Issuance of a Permit, supra, 120 N.J. 164, 576 A.2d 784. There DEP's issuance of a New Jersey Pollutant Discharge Elimination System (NJPDES) permit for the discharge of chemically treated effluent into the Atlantic Ocean had been appealed by the Borough of Lavallette, the Borough of Seaside Park, an environmental protection group and a number of "concerned citizens." Such permits are issued under the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A-1 to -43. The Court found that DEP had not made sufficient findings on the record as to certain statutory criteria in that Act that were prerequisites to the issuance of a NJPDES permit. Id. at 174-79, 576 A.2d at 789-92.
DEP suggests that because neither the FWPA nor its implementing regulations require DEP to respond to public comments on any application for a LOI or a general permit and require DEP to only "consider" the comments of the general public during its review of a LOI application, N.J.A.C. 7:7A-3.5(c), and during its review of any permit application, N.J.A.C. 7:7A-12.3(d), the Supreme Court's decision is not applicable. We disagree, at least in the context of the record involved in this GP6 permitting process. First, while it is the FWPA individual permitting process which directly parallels that of the NJPDES permitting process, the necessity to company a permitting decision with explanatory findings is not mandated by the NJPDES's statutory scheme that was *462 before the Court in In re Issuance of a Permit any more or less than by the FWPA general permitting statutory scheme. That is to say, all NJPDES and FWPA permitting actions require that certain findings first be made by DEP consistent with the applicable statutory criteria.[8] Second, of critical concern to the Court in In re Issuance of a Permit were the important policies served by the NJPDES permitting process and the applicable statutory criteria which the affected parties and a reviewing court must be assured were demonstrated by the agency record and found by the agency. Id. at 179-81, 576 A.2d at 792-93. The FWPA permitting process at issue before us serves no more nor less important legislative policies and must adhere to equally important, albeit different, statutory criteria.
Third, the record here contains an abundance of factual material which could easily support a contrary determination. DEP has never disputed that the evidence does support a conclusion that the subject property has wetlands which, when flooded, results in off-site flows. We are informed that during the unrecorded meeting with DEP officials, POND's expert, and other interested persons, DEP advised that the photographs submitted by appellant in May 2001 and June 2002 (and presumably the videos) did "not reveal any evidence of the mandatory scouring, erosion, or concentrated flows," on the property and thus did not demonstrate an interconnection between the on-site wetlands and a tributary system. N.J.A.C. 7:7A-1.4.
To be sure, the record does not clearly identify areas of "scouring" or "erosion." But, there is ample evidence of water flowing from the property. DEP advised people at the meeting we have referred to that this flow was only "sheet" flow. Neither "sheet flow" nor "concentrated flow" are statutorily or regulatorily defined. DEP gives us a dictionary definition thereof as such:
"concentrated" is defined as "[t]o draw toward a common center" or "[t]o gather together in a single main body." Webster's II New Riverside University Dictionary, 293 (1988). "Flow" is defined as "[t]o proceed steadily and easily." Id. at 489. ... "sheet" is defined as "[a] broad, flat continuous surface or expanse." Id. at 1073.
Not only do these dictionary definitions not appear significantly distinct, but DEP has not articulated what it is about the photographs, videos, Thonet reports and residents' description of the wet conditions in the area, that distinguishes the depicted "sheet flow" from a "concentrated flow."
We understand the observations were made from off-site as no on-site inspection by the objectors was permitted. However, the evidence, even from off-site, clearly shows, at the least, a seasonal flow of water from the subject property into some sort of drainage system. Why is the condition only "sheet flow"? We cannot discern that from our lay view. Perhaps there is DEP expertise to which we could defer, that would fully explain the difference. But we cannot discern that from either the LOI decision or the GP6 permit decision. Neither does Jones's July 25, 2002, letter of response to the Thonet report fill in the necessary gaps.
We also point out our discomfort in blindly accepting DEP's determinations *463 based upon the limited scope of review doctrine in light of DEP's 1986 Freshwater Wetlands map which seems to show the wetlands on the subject property as part of an inland tributary system. Perhaps it is out of date. Perhaps there is some expert analysis to support a contrary conclusion.[9] But DEP has not yet provided that to either the parties or the court. Of some nagging concern to us, too, is the fact that DEP's on-site inspections were conducted only during a dry period. If it has never observed first-hand the "flow" conditions, how can it be confident that the "flow" is simply "sheeting" and not "concentrated"?
It is for these reasons that we, therefore, agree with point I and parts of point II and remand to DEP for a fact-finding analysis. That fact-finding should address the deficiencies we have identified. Although we are hesitant to direct DEP to conduct an additional on-site inspection during a wet season, we would suggest that a subsequent reviewing court could better analyze the record deficiency arguments of appellant in points II and III of its brief were that performed.
Remanded for further investigative analysis as may be determined by DEP based upon our opinion and for the necessary fact-findings we have held are required. We do not retain jurisdiction.
NOTES
[1] A statewide Freshwater Wetlands Permit 10A was also issued. Neither appellant nor amicus refer to this permit in their briefs or present any arguments relating to its validity. We do not, therefore, address it, except to observe that our disposition here would apply equally to the GP10A.
[2] In addition to general permits, DEP can issue individual freshwater wetlands permits which are governed by N.J.S.A. 13:9B-9 and -10, and by N.J.A.C. 7:7A-7.1 to -7.5. Compared to a general permit, individual permits require the applicant to meet more demanding standards and requirements. See N.J.S.A. 13:9B-9B(1) to (9).
[3] Surface waters are defined as any above-ground water of the State except for groundwater, including "the ocean and its tributaries, all springs, streams, rivers, lakes, ponds, wetlands, and artificial waterbodies." N.J.A.C. 7:7A-1.4.
[4] The wetlands identified by Markowitz were delineated by his engineering expert based upon a December 2000 site inspection. We note, also, the previously mentioned DEP 1986 Freshwater Wetlands map showing wetlands on the property which appears to be connected to a large wetland system.
[5] A ditch is "a linear topographic depression with bed and banks of human construction, which conveys water to or from a site, which is surrounded by uplands and which is not located within a wetland[; it] does not include channelized or redirected natural water courses." N.J.A.C. 7:7A-1.4.
[6] A swale is a linear topographic depression, either naturally occurring or of human construction, which meets all of the following criteria:

1. It is surrounded by uplands except where runoff flows out of it. A depression is not a swale if it is located within a larger wetland or if it is merely an undulation in a wetland boundary;
2. It has formed or was constructed in uplands to convey surface water runoff from the surrounding upland areas;
3. It drains less than 50 acres;
4. It is not a seep or spring;
5. It is not an intermittent stream;
6. It has no definite bed and banks; and
7. At its widest point, it is generally 50 feet wide or narrower.
[7] The denial of that request is the subject of a separate appeal. I/M/O Freshwater Wetlands Statewide General Permits, Docket No. A-776-03T3. We affirm that denial in our separate opinion filed simultaneously with this opinion.
[8] Of course, the nature and extent of these findings differs, depending upon the type of permit. For instance, as we have pointed out, FWPA individual permits require a more rigorous analysis than FWPA general permits. Compare N.J.S.A. 13:9B-8 with N.J.S.A. 13:9B-23. But the point is, no permit can be issued or denied, absent satisfaction of the applicable statutory criteria.
[9] We note, too, N.J.A.C. 7:7A-2.3(e) which provides:

[t]hese freshwater wetlands maps can help to determine the approximate extent and location of wetlands. However, these maps are for guidance only and do not take the place of nor supersede a wetland delineation that the Department has approved through a letter of interpretation issued for a particular site.