**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0943-19T4

RICHARD LAFFERTY and
PAMELA LAFFERTY, and
RICHARD LAFFERTY and
PAMELA LAFFERTY, as
TRUSTEES OF THE RICHARD
LAFFERTY LIVING TRUST
DATED DECEMBER 8, 2008
with a 50% interest, and PAMELA
LAFFERTY and RICHARD
LAFFERTY as TRUSTEES OF
THE PAMELA LAFFERTY
REVOCABLE LIVING TRUST
DATED DECEMBER 8, 2008 with
a 50% interest, as tenants in common,

     Plaintiffs-Respondents,

v.

JULIAN ANTEBI and HILARY
A. BURKE,

     Defendants-Appellants,

and

GREG FONTAINE, d/b/a A&E
CONSTRUCTION and MAPLE
TREE FARM LANDSCAPING,

INC.,

Defendants.
_____

Argued December 9, 2019 – Decided February 21, 2020

Before Judges Sumners, Geiger and Natali.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0452-10.

Robert E. Levy argued the cause for appellants (Scarinci & Hollenbeck, LLC, attorneys; Robert E. Levy, of counsel and on the briefs; Rachel E. Simon, on the briefs).

W. John Weir, II, argued the cause for respondents (Weir Attorneys, attorneys; W. John Weir, II, of counsel and on the briefs; George Herbert Flammer, Jr., on the briefs).

PER CURIAM

On leave granted, defendants Julian Antebi and Hilary Burke appeal from five Law Division orders in this protracted litigation between adjoining landowners involving claims of nuisance and trespass caused by water runoff. More specifically, they seek reversal of: (1) a March 29, 2016 order requiring defendants to produce a plan by a licensed engineer that will eliminate all drainage and runoff of water onto property owned by plaintiffs Richard Lafferty, Pamela Lafferty, and a related Living Trust, from specified sources; (2) a March

24, 2017 order granting plaintiffs interim relief requiring defendants to fill in a swale[1] in their backyard within forty-five days, disconnect all downspouts from piping that directs water to the area of a sump pump discharge, and move the current sump pump discharge location to a point within ten feet of the current sump pump discharge; (3) an August 9, 2019 order requiring defendants to excavate soil profile pits and conduct soil permeability testing within twenty days in the area in which storm water infiltration is proposed, have their expert prepare a report of his or her findings and recommendations, and requiring plaintiffs to set forth any written objections to defendants' corrective plan within ten days of receipt; (4) a September 27, 2019 order denying reconsideration of the August 9, 2019 order and other relief; and (5) an October 4, 2019 order denying a stay of the August 9, 2019 and September 27, 2019 orders.

I.

This case arises out of a dispute between neighbors who own adjacent residential properties in the Borough of Pennington. In August 2011, plaintiffs filed a seven-count amended complaint, averring that defendants increased

---

[1] "A swale is a linear topographic depression, either naturally occurring or of human construction, which . . . convey[s] surface water runoff from the surrounding upland areas." In re Freshwater Wetlands Gen. Permits, 372 N.J. Super. 578, 587 n.6 (App. Div. 2004).

A-0943-19T4

drainage and water runoff onto plaintiffs property as a result of the addition and improvements defendants constructed in 2005, causing a nuisance and trespass to plaintiffs' real property.[2]  In response, defendants denied the allegations and filed counterclaims for nuisance and trespass to real property, alleging that plaintiffs altered the natural flow of drainage and water runoff, causing flooding and damage to defendants' property.  The counterclaims were premised upon plaintiffs' May 2006 and October 2009 alterations to their land.  Defendants claimed that plaintiffs' "un-engineered attempts to prevent water from crossing over their property caused defendants' property to be the basin in which all of the neighborhood storm water collects, without an exit."

The trial court conducted an eight-day bench trial in September 2015, with the issues limited to plaintiffs' and defendants' claims of trespass and nuisance. Both parties presented expert engineering testimony.

After the parties rested, the court directed them to submit proposed findings of fact and conclusions of law.  The court entered an October 8, 2015 order directing defendants to produce all records of municipal approvals for the addition to their home.  Intervening motion practice delayed the trial court's

---

[2]  In their amended complaint, plaintiffs also asserted claims for invasion of privacy, slander, and intentional infliction of emotional distress.  Those claims, and the claims against the other defendants, were resolved prior to trial.

decision. On March 4, 2016, the judge conducted a site inspection of the parties' properties.

Ultimately, the court issued a March 29, 2016 order (the No Water order) and twenty-page opinion. The court made the following findings of fact. A 140-foot long storm water easement in favor of the Borough, located on 12 Abey Drive, parallels the property line with plaintiffs' property. A concrete culvert that is a component of the Borough's storm water system, is located on 12 Abey Drive approximately forty feet from plaintiffs' property.

After observing water on their property near its border with defendants' property in September 1986, plaintiffs contacted Borough officials who sent the Borough's engineer to examine the property. The engineer discovered that the water build-up resulted from a sump pump on defendants' property.

In 1987, plaintiffs built a sixty-five-foot long planter constructed of wood and railway ties near the property line, with the intent to divert water away from their property. In 1991, plaintiffs extended the planter forty-five feet towards the rear of their property. The extension included subsurface drainage pipes designed to collect water and discharge it near the edge of the concrete culvert.

In 1997, plaintiffs constructed an addition onto their home and diverted drainage pipelines to more directly carry the water to the concrete culvert.

5

Plaintiffs averred that their addition complied with all building codes and zoning ordinances. Plaintiffs acknowledged that from 1991 to 2005, the planter and subsurface drainage pipes worked satisfactorily, removing the water emanating from defendants' sump pump.

During the summer of 2005, defendants built an addition onto the rear of their home. As a result of the construction and subsequent landscaping, defendants made the following changes to their property: (1) the sump pump discharge was relocated to approximately twelve feet from the parties' property line and further to the rear of defendants' property; (2) defendants connected the leaders and gutters on the new addition to PVC pipes that discharged water at the same place as the sump pump, increasing water runoff; (3) a swale was excavated on the upside of defendants' property that flowed into a PVC pipe that discharged water at the same place as the relocated sump pump; (4) another swale was excavated along the rear of defendants' property that collected water from 18 Abey Drive and channeled it to the rear of plaintiffs' property beyond the end of the planter; and (5) defendants spread the excavated dirt, increasing the slope of their property towards plaintiffs' property.

In May 2006, plaintiffs installed a twelve-foot long PVC ground drain approximately four feet from parties' property line, which was connected to the

6

existing piping, to limit flooding on their property. Railway ties were installed behind the ground drain. Finally, in October 2009, plaintiffs elevated part of their front yard approximately twelve inches to divert water away from their property to the street.

The court noted that plaintiffs' expert, Gary Gartenberg, testified that construction of the swale on the upside of defendants' property, along with connecting it and the roof leaders and gutters to the underground drainage system, discharged excess water at the relocated sump pump discharge point, significantly increasing runoff. Water drainage through the swale also increased drainage and runoff, creating a flooding problem on plaintiffs' property. The work done by defendants in 2005 affected the natural flow of water, increased the runoff, and concentrated the discharge at two points—the end of the swale and the relocated sump pump discharge.

Gartenberg opined that all the 2005 site improvements made by defendants should be removed and defendants' property should be restored to its prior condition to remediate the flooding on plaintiffs' property. This included removal of the underground piping, ground drains, swales, and excavated soil from defendants' property.

A-0943-19T4

The court noted that defendants' expert, Walter Wysowaty, testified that the increase in the impervious surface area caused a negligible increase storm water runoff. He confirmed that plaintiffs' property is the low point in the neighborhood and that water that runs across the property discharges into the drainage ditch and concrete culvert.

The trial court concluded that plaintiffs proved a prima facie case of trespass to real property and nuisance entitling them to equitable relief. In reaching that determination, the court found plaintiffs demonstrated that defendants made the changes to their property in the course of adding an addition in September 2005 that increased drainage and runoff of storm water onto plaintiffs' property. These changes included:

> (1) Relocating the discharge point of the sump pump and thereby increasing the drainage and water runoff onto [p]laintiffs' property;
>
> (2) Connecting new and pre-existing ground drains and roof leaders to the sump pump, which increased drainage and water runoff onto [p]laintiffs' property;
>
> (3) Creating swales to direct the flow of drainage and water runoff which increased the amount of drainage and water runoff onto [p]laintiffs' property;
>
> (4) Re-grading their land thereby increasing the slope of their property and increasing drainage and water runoff onto [p]laintiffs' property; and

A-0943-19T4

(5) Increasing the impervious surface area of the roof drainage, which increased drainage and water runoff onto [p]laintiffs' property.

The court concluded:

By increasing the amount of drainage and water runoff onto [p]laintiffs' property, defendants have engaged in a pattern of continuing trespass from September 2005 to the present time, which has limited [p]laintiffs' right to quiet enjoyment of their property. The court also finds [d]efendants['] actions contributed to the increased flow of drainage and water runoff onto [p]laintiffs' property, which resulted in an unreasonable interference with their land.

Regarding defendants' counterclaims, the court found:

Defendants have not put forth a prima facie case of trespass to real property and/or nuisance. Therefore the [c]ourt cannot grant equitable relief to [d]efendants at this time. Defendants have not quantified the amount of water originating from adjoining properties. The [c]ourt notes that [d]efendants acknowledged at trial that they made the above-mentioned changes to their property, which increased the amount of drainage and/or water runoff onto [p]laintiffs' property.

The trial court ordered defendants to produce a detailed plan prepared by a licensed engineer that "will eliminate all drainage and runoff of water onto the [p]laintiffs' property" caused by defendants' 2005 modifications to their property.

A-0943-19T4

On May 24, 2016, the court appointed engineer Steven J. Morris, P.E., R.S., as a neutral expert to review the plans prepared by the parties' respective engineering experts to remedy the flooding problem. Morris analyzed the plans, met with the parties, and visited the site on December 9, 2016. On March 15, 2017, Morris issued his report to the court. Relevant here, the report stated:

> Given the historic and current topography in the vicinity of the subject properties, [i]t is not reasonable or practical to eliminate all storm water flow from 16 Abey to 14 Abey. However, steps must be taken to prevent [i]ncreased volume, [i]ntensity and/or concentration of storm water flow from 16 Abey to 14 Abey.

Morris reiterated this point during his testimony:

> I think it's important to understand that for a long history water has flowed across the site, across 16 on 14. It will still continue to do that. And for everything to work properly it's important that the owners on 14 don't change the topography, build more walls, do anything that's going to inhibit that water flow. So the water can continue to flow as it always did, across 14 and – [o]ff 16, across 14 and into the regional system, which is the culvert and the swale to the northeast.

Because the flow of water could not be completely eliminated, Morris opined:

> The Storm Water Management Plan For 16 Abey Drive, . . . prepared by Hopewell Valley Engineering, PC appears to reasonably accomplish the requirement to eliminate increased flow rate of storm water runoff discharging from the property of 16 Abey onto the property of 14 Abey which results from the house

10

addition and site modifications made at 16 Abey in September 2005.

Morris testified that Hopewell Valley Engineering, PC (Hopewell), had a two-part plan to remedy the flooding. First, Hopewell sought to install an "Aquablox water system," a water "detention system,"

> which is essentially a big box in the ground that will collect the storm water, hold it there until that water can be either leached into the ground, or in the event of severe rains will allow some of that water to overflow and discharge down-slope towards 14 [Abey Drive] or onto 14 [Abey Drive].

Second, Hopewell intended to divert water collected by a "side swale" defendants created in 2005 while constructing the addition to their home, to the "back of [defendants'] property, then let it flow towards the plaintiffs'" property. The swale that Hopewell proposed to construct would "move that water that comes from 18 Abey Drive into the side swale to the back of [defendants'] property" and then towards plaintiffs', where it would eventually transition to the culvert.

Soil permeability tests were also performed on defendants' property. According to Morris:

> The soil permeability data upon which the system has been designed is based upon two (2) sample locations, Log 1 and Log 3. The reported permeability rates for each are Log 1 — 0.3 [inches per hour] and Log 3 —

0.2 [inches per hour].  The system is located at Log 2 where no permeability data is provided.  The design appears to assume that the higher permeability rate will also be found at Log 2.  If this is not the case, the system will not perform as intended.  I suggest that one of the following steps to be taken to improve the likelihood of successful operation of the system:

(1) Relocate the system to Log 1 location.

(2) Field verify the permeability of the soils at the proposed location of the system.  If necessary, increase the depth of excavation at that location to achieve the required permeability.

(3) Resize the system using the more conservative permeability based upon Log 3 — 0.2 [inches per hour].

On March 24, 2017, the trial court granted plaintiffs' motion for interim relief and further ordered that within forty-five days defendants:

shall fill in the [side] swale in the backyard created in 2005 by filling with topsoil to a height which shall be equal with the immediately surrounding area and shall seed the new topsoil and cover with straw so as to prevent erosion; . . . that defendants shall disconnect all downspouts from piping which directs water to the area of the current sump pump discharge and shall insure that ground water from the existing underground piping no longer enters the pipes; . . . [and] that defendants shall move the current sump pump discharge location to a point within [ten] feet of where the pipe exits the foundation of the house and shall run the pipe to daylight.

Defendants complied with this order.

A-0943-19T4

Subsequently, plaintiffs built an "un-engineered" wall near the parties' property line. According to a certification by Hopewell's president, Russell M. Smith, P.E., P.P., he

> observed that in July and August, 2018 plaintiffs made modifications to their property which in my professional opinion now substantially inhibits the natural flow of surface stormwater flow from 16 Abey Drive to 14 Abey Drive. In addition, the unilateral changes to plaintiffs' property may have caused the plans under review to be obsolete and moot, especially since the [d]efendants have, pursuant to an interim Order, filled in and removed the rear swale, disconnected the downspouts and changed the exit point of the sump pump discharge.

At this point, defendants advocated for Hopewell's plan to remedy the flooding while the plaintiffs advocated for a plan by Trenton Engineering Company, Inc. (Trenton Engineering). During a March 12, 2019 hearing, Smith testified that Hopewell's plan was to first install an Aquablox system that would be able to hold the extra storm water created by defendants' addition to their home and sustain a one-hundred-year-storm, draining in seventy-seven hours after the occurrence. Hopewell also proposed adding a swale, "designed to carry the water down the western side of [defendants'] house . . . across to the east towards the back of their property." Then the proposed swale would "direct[] all of the water that would come across . . . towards the back of [plaintiffs']

A-0943-19T4

property." Smith concurred with Morris' suggestion to move the Aquablox system to Log 1 and agreed that no permeability test was performed at Log 2.

Plaintiffs argued that the Hopewell plan was inadequate to comply with the No Water order; to counter Smith's testimony they retained consulting soil expert Steve Dadio. His testimony focused on the three soil tests performed on defendants' property. Dadio recommended further soil testing be performed to determine whether the Aquablox system could work on plaintiffs' property. In his opinion, it would be better to manage the soils "on the entirety of [defendants'] property." This included characterizing the different soil layers, conducting permeability tests, collecting soil samples for topsoil fertility analysis, and doing soil bulk density measurements, all to create a hydraulic profile showing "where the different infiltration rates and the different depths are."

Joe Mester, P.E., P.L.S., of Trenton Engineering, testified that the plan he prepared for plaintiffs, was a "two[-]tier system." First, he designed a swale running along the southerly line that would catch all of the water from the south and divert it to the front and, if possible, have the captured water flow onto the front yard and then run to the street. Second, Mester proposed a small pump chamber at the southern end of defendants' property that would pump the water

14

into the proposed swale, which would also divert that water to the front yard. However, without further soil testing, he did not know whether the pump chamber could be smaller, could go deeper, and would have better infiltration. As a result, Mester agreed with Dadio that further soil testing should be done on defendants' property.

Mester further testified that his design was meant to comply with the No Water order. He criticized Hopewell's plan because "it was not designed to implement the [No-Water] order," meaning it did not "prevent all . . . storm water from going from [defendants'] property to [plaintiffs'] property."

Conversely, Smith "strongly disagreed" with Trenton Engineering's plan. He found the plan "directly contradict[ed] the natural patterns of drainage in this area. It essentially turns [defendants'] property into a neighborhood storm water basin and it disturbs the entire property and does not address the 2005 addition."

In a subsequent August 9, 2019 order, the trial court directed "that soil profile pits and permeability testing shall be conducted in the area in which storm water infiltration is proposed within twenty (20) days of the entry of this [o]rder." It further directed

> that upon completion of the soil testing, the soil professional shall prepare a report for the [c]ourt detailing his or her findings and further recommendations for soil remediation so as to provide

15

sufficient permeability such that an appropriate final plan can be implemented to eliminate drainage and runoff from 16 Abey Drive onto 14 Abey Drive as per the [c]ourt's prior [o]rder. The [d]efendants must include all drainage of the water runoff from the swell.

The court concluded there was no other way it could proceed, stating:

There is clearly an issue regarding an underground hanging water table.[3] Unless it is determined and measurements are taken by the appropriate engineers and experts, the plan which is proposed may not be complete because the -- some of the calculations may change and require modifications, corrections and/or changes to the plan to remediate this matter.

Defendants moved for reconsideration. They also sought an order directing: (1) Hopewell to inspect plaintiffs' land modifications made in the summer of 2018; and (2) plaintiffs to provide any report created by Hopewell and their inspection of those modifications. On September 27, 2019, the court denied all of defendants' requests. Finally, on October 4, 2019, the court denied defendants' motion to stay the August 9 and September 27 orders.

---

[3] A hanging or perched water table occurs when there is an impermeable layer of rock or sediment above the primary water table but beneath the surface of the ground. Perched water is groundwater in a saturated zone separated from the main water table by the impermeable layer. Webster's Third New International Dictionary, 1675 (1971).

A-0943-19T4

We granted defendants' emergent motion for leave to appeal, to stay the trial court's order, and to supplement the record.

On appeal, defendants argue: (1) the No Water order and its progeny are legally invalid; (2) plaintiffs do not contest that the "reasonable use doctrine" governs this dispute; and (3) defendants' request to use the municipal culvert is reasonable.

II.

A.

Our review of the factual findings made by the trial court following a non-jury trial is limited. State v. Frank, 445 N.J. Super. 98, 105 (App. Div. 2016) (citing State v. Locurto, 157 N.J. 463, 470-71 (1999)). "[W]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). Nor do we "disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169

17

(2011) (alteration in original) (quoting In re Tr. Created By Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)).

Our task is to determine whether "there is substantial evidence in support of the trial judge's findings and conclusions." Rova Farms Resort, Inc. v. Inv'r Ins. Co. of Am., 65 N.J. 474, 484 (1974) (citation omitted); accord In re Tr. Created By Agreement, 194 N.J. at 284. Legal conclusions, however, are reviewed de novo. State v. Ghandi, 201 N.J. 161, 176 (2010); see also Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (we owe no deference to a trial court's "interpretation of the law and the legal consequences that flow from established facts").

## B.

In deciding whether the record supports the trial court's determination that defendant is liable on nuisance and trespass theories, we are guided by established case law and the Restatement (Second) of Torts, (Am. Law Inst. 1979) (Restatement). See Perez v. Wyeth Labs., Inc., 161 N.J. 1, 14-15 (1999) (recognizing the complementary role of the Restatements of law with common law); see also Ross v. Lowitz, 222 N.J. 494, 506, 510 (2013) ("[o]ur courts have adopted the standard of Restatement section 822 to assess liability for private

nuisance" and "also apply the Restatement's standard of liability where a plaintiff pursues a trespass claim").

"Trespass and private nuisance are alike in that each is a field of tort liability rather than a single type of tortious conduct. In each, liability may arise from an intentional or an unintentional invasion." Restatement § 821D cmt. d. Further, "the flooding of the plaintiff's land, which is a trespass, is also a nuisance if it is repeated or of long duration." Id. at cmt. e.

Our Supreme Court recently discussed liability for trespass and nuisance caused by flooding. In Ross, the plaintiffs asserted claims for private nuisance and trespass when heating oil leaked onto their residential property from a storage tank located on their neighbor's residential property. 222 N.J. at 497. The Court began its analysis of plaintiff's nuisance claim with the general rule set forth in section 822 of the Restatement[4]:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless

---

[4] Section 822 has not been changed by the Restatement (Third) of Torts (Am. Law Inst. 2005). Ross, 222 N.J. at 505 n.7.

conduct, or for abnormally dangerous conditions or activities.

[Id. at 505.]

As the Ross Court explained, "an 'intentional but reasonable' or 'entirely accidental' invasion does not trigger liability under a private nuisance theory." Id. at 506 (quoting Restatement § 822 cmt. a). Rather, a claim of private nuisance is predicated on the "unreasonable interference with the use and enjoyment" of another's land. Id. at 505 (citations omitted); Smith v. Jersey Cent. Power & Light Co., 421 N.J. Super. 374, 389 (App. Div. 2011). Thus, "an actor is [not] liable for accidental interferences with the use and enjoyment of land but only for such interferences as are intentional and unreasonable or result from negligent, reckless or abnormally dangerous conduct." Ross, 222 N.J. at 506–07 (quoting Restatement § 822 cmt. b); see also Birchwood Lakes Colony Club, Inc. v. Medford Lakes, 90 N.J. 582, 591-92 (1982).

Regarding intent, section 822 of the Restatement refers to section 825, which defines an intentional invasion of property as one where the actor "(a) acts for the purpose of causing it, or (b) knows that it is resulting or is substantially certain to result from his conduct." However, comment (d) to section 825 of the Restatement explains that "the first invasion resulting from the actor's conduct may be either intentional or unintentional; but when the

20

conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional."  See Smith, 421 N.J. Super. at 389 (same); see also Restatement § 8A cmt. a ("intent" as used in the Restatement "has reference to the consequences of an act rather than the act itself").

Here, although the trial court cited section 822 of the Restatement, it did not explicitly state whether defendants' conduct was "intentional and unreasonable" under subsection (a), or "unintentional" and "negligent" or "reckless" under subsection (b).  Instead, it found that by increasing drainage and runoff onto plaintiffs' property, defendants "engaged in a pattern of continuing trespass from September 2005 to the present time, which has limited [p]laintiffs' right to quiet enjoyment of their property" and "resulted in an unreasonable interference with their land."

It appears the trial record supports a finding that defendants' initial surface water "invasion" of plaintiffs' property was unintentional.  Accordingly, the issue of defendants' liability could turn on their conduct after they were made aware of the resulting impact.  See Restatement § 825 cmt. d.

The trial court is also required to determine whether defendants' actions were reasonable.  In Armstrong v. Francis Corp., the Court declared its adherence to the "reasonable use rule," and elicited the following factors for

court's to consider: "the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter." 20 N.J. 320, 329-30 (1956). The court should also address section 826 of the Restatement, which provides:

> An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if
>
> (a) the gravity of the harm outweighs the utility of the actor's conduct, or
>
> (b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible.

Further, Rule 1:7-4(a) requires a trial court to "find the facts and state its conclusions of law thereon in all actions tried without a jury." Such findings are of "critical importance" to "both the trial and appellate process." Pressler & Verniero, Current N.J. Court Rules, cmt. 1 on R. 1:7-4(a) (2020). The trial court must also generally state its credibility findings even where they "may not be susceptible to articulation in detail." Ibid. (citing Locurto, 157 N.J. at 474).

In rendering its decision, the trial court did not assess the credibility of the experts or other witnesses or determine the relative weight to be given to their respective testimony and reports. Absent such findings, we are effectively

prevented from determining whether "there is substantial evidence in support of the trial judge's findings and conclusions." Rova Farms, 65 N.J. at 484.

We further note that the trial court did not discuss the report or testimony of the court appointed engineering expert, Morris. His report concluded that given the past and present topography of the subject properties and surrounding vicinity, "[i]t is not reasonable or practical to eliminate all storm water flow from 16 Abey [Drive] to 14 Abey [Drive]." During his testimony, Morris noted that historically, water had flowed across 16 Abey Drive onto 14 Abey Drive and would continue to do so. He opined that "for everything to work properly it's important that [plaintiffs] don't change the topography, build more walls, do anything that's going to inhibit that water flow" so that "the water can continue to flow as it always did, . . . [o]ff 16 [Abey Drive], across 14 [Abey Drive] and into the regional system, which is the culvert and the swale to the northeast." Morris concluded that the Storm Water Management Plan for defendants' property prepared by Hopewell Valley Engineering "appears to reasonably accomplish the requirement to eliminate increased flow rate of storm water runoff discharging from [defendants'] property . . . onto [plaintiffs'] property . . . which results from the house addition and site modifications made at 16 Abey [Drive] in September 2005."

A-0943-19T4

Morris' report and testimony indicate that the requirements imposed by the No Water order are unachievable and the goals of the order unrealistic. Our ability to review the No Water order and subsequent orders is severely hampered by the failure to evaluate and give appropriate weight to Morris' report and testimony.

From this record we are unable to determine whether the trial court's findings and conclusions of law are supported by substantial credible evidence in the record. Further, we cannot discern whether defendants' conduct was either intentional and unreasonable or unintentional and negligent or reckless. Nor are we the trier of fact, which is normally entrusted to make such assessments. See e.g., Hitesman v. Bridgeway, Inc., 218 N.J. 8, 31 (2014). We are thus constrained to reverse the trial court's orders and remand this matter.

On remand, the trial court shall make credibility findings and determine the appropriate weight to be given to the testimony of the witnesses and the experts' opinions. The court shall also determine the intentionality of defendants' conduct as defined in section 825 of the Restatement. The court shall then apply the factors set forth in Armstrong and section 826 of the Restatement to determine reasonableness under the "reasonable use" test. In

doing so, the court should also balance the utility of defendants' conduct with the resulting harm to plaintiff.  Armstrong, 20 N.J. at 330; Restatement § 825.

On remand, the trial court shall also reevaluate the dismissal of defendants' counterclaims based on its findings.  This reevaluation should include addressing defendants' trespass to the property and nuisance claims pertaining to plaintiffs' 2018 modifications to their property.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION