**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5525-17
A-2208-18

IN THE MATTER OF NEW
JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION
WATERFRONT DEVELOPMENT
PERMIT, FLOOD HAZARD AREA
INDIVIDUAL PERMIT AND
FLOOD HAZARD AREA
VERIFICATION, 1500-16-0004.1
WFD16001, 1508-18-0002.1
FHA18001, and 1508-18-0002.1
FHA180002.

_____

IN THE MATTER OF NEW
JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION
FRESHWATER WETLANDS
GENERAL PERMIT #1 AND
WATER QUALITY CERTIFICATE
PERMIT NO. 1508-18-0002.1
(FWW180001).

_____

Argued November 8, 2021 – Decided November 24, 2021

Before Judges Sabatino, Rothstadt and Mayer.

On appeal from the New Jersey Department of Environmental Protection.

R. William Potter argued the cause for appellants Martha Steinberg, Gamal El-Zoghby, Michael Knight, Ricardo Valdes, Michael Pierro, Michele Pierro, David Fox, Andreas Beutler, Michaela Banck, The New Jersey Conservation Foundation, and Environment New Jersey (Potter and Dickson, attorneys; R. William Potter, on the briefs).

Jason Brandon Kane, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Andrew J. Bruck, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jason Brandon Kane, Deputy Attorney General, on the brief).

Amy Chung, Deputy Attorney General, argued the cause for respondent New Jersey Department of Transportation (Andrew J. Bruck, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; David M. Kahler, Deputy Attorney General, on the brief).

Afiyfa H. Ellington argued the cause for intervenor Westecunk Creek Association (Giordano, Halleran & Ciesla, PC, attorneys; Michael J. Gross and Afiyfa H. Ellington, on the brief).

Daniel A. Greenhouse argued the cause for amicus curiae Save Barnegat Bay (Eastern Environmental Law Center, attorneys; Daniel A. Greenhouse and William D. Bittinger, on the brief).

PER CURIAM

This consolidated appeal challenges three permits issued by the Department of Environmental Protection ("the DEP") in 2018 to its fellow state agency, the Department of Transportation ("the DOT"). If they are valid, the permits allow the DOT to (1) dredge three waterways that flow into the Barnegat Bay; and (2) deposit the wet dredged material into a nearby earthen pit known as a confined disposal facility ("CDF") in Eagleswood Township in Ocean County. The dredged material placed in the CDF eventually dries out, and can be used for other purposes.

The West Creek CDF was originally built in 1966. Further construction of it took place pursuant to a five-year permit issued in 1983 by the DEP, with the approval of the Army Corps of Engineers ("Army Corps"). The project authorized by that permit involved the dredging of a single waterway, the Westecunk Creek. In the ensuing decades since 1983, the CDF's eastern berm, facing the bay, has substantially eroded and several people have built and occupied homes across from the CDF. The DOT purchased the CDF site in 2006.

The challenged 2018 permits would allow the DOT to relocate soil into and raise the berm walls of the CDF from an above-ground height of about six feet to a height of up to fifteen feet. Doing so increases the cubic volume of

3

the CDF by approximately six times the capacity that had been approved and built in 1983.

Appellants are several residents and two environmental groups who complain the present construction of the CDF disturbs the wetlands and threatens endangered species. Although they do not contest the DEP permits insofar as they authorize the dredging of the waterways, appellants contend the permits concerning the CDF are invalid under the applicable statutes and regulations. As part of that contention, they argue the CDF has been abandoned since 1983.

Among other things, appellants and an amicus environmental organization assert that the DEP improperly issued a "General Permit" under N.J.S.A. 13:9B-23 of the Freshwater Protection Act, N.J.S.A. 13:9B-1 to -30 ("FWPA") for the CDF project. They argue the DEP should have conducted the more rigorous process for issuing what is commonly known as an "Individual Permit" under N.J.S.A. 13:9B-9 of FWPA. For this and other reasons, they seek to rescind the permits and halt the ongoing construction of the CDF.

Respondents, the DEP and the DOT, joined by an intervenor group of boat owners and others who use the waterways being dredged under the

permits, argue the permits in question are all valid and comport with the applicable environmental statutes and regulations. As a key part of their defense, respondents contend the current CDF project is merely a fortification of the CDF previously approved in 1983 and that it does not require an Individual Permit under FWPA. Respondents further contend the conditions set forth in the permits adequately protect the environment and local wildlife habitats.

For the reasons that follow, we remand this matter to the DEP for reconsideration and more specific findings addressing whether the CDF project complies with the applicable freshwater wetlands regulations. Among other things, the DEP must (1) address what appears to be the substantial enlargement of the CDF from its 1983 dimensions and whether that is an "expansion" disallowed under a General Permit; (2) address whether the CDF as rebuilt in 1983 was subsequently abandoned; (3) address whether depositing dredged material from three waterways rather than one into the CDF is allowed by a General Permit, and; (4) perform a more fulsome analysis of whether the deviations from the 1983 project are only "minor," giving explicit consideration to the objectors' expert reports.

5

In all other respects, we reject appellants' legal challenges and affirm on those issues.

I.

This matter specifically concerns permits issued by the DEP's Division of Land Use to the DOT's Office of Maritime Resources ("OMR") approving of permits for two projects: (1) a June 27, 2018 Waterfront Development ("WFD") Individual Permit (in-water) and Flood Hazard Area ("FHA") Individual Permit and Verification, authorizing the DOT to conduct hydraulic maintenance dredging of three channels to improve vessel navigation in the Barnegat Bay (the "dredging project"); and (2) a December 17, 2018 Freshwater Wetlands General Permit No. 1 ("FWWGP1" or "GP1") and combined Water Quality Certificate ("WQC"), together authorizing the DOT to renovate and reconstruct the West Creek CDF on Dock Road, at Block 1, Lot 2.01, in Eagleswood Township to maintain and store the dredged material (the "CDF project").

We recite for completeness the salient aspects of the extensive administrative record. In doing so, we note no adjudicatory factfinding hearings were conducted, although the parties substantially agree on much of the history.

A-5525-17

History of the West Creek CDF

The property in question is Block 1, Lot 2.01 on the Eagleswood Township tax map. Lot 2.01 consists of approximately 25.914 acres on the southern side of Dock Road, a twenty-four-foot wide, two-lane paved roadway with a limited shoulder and no sidewalks. At the eastern dead-end of Dock Road is a waterfront public park and Green Acres recreational pier. Across the street from Lot 2.01 are residential waterfront properties mostly developed after 1983 and, at the time of these appeals, owned by various appellants. The northern boundary of these properties abuts the Westecunk Creek in Eagleswood Township. Farther inland along Dock Road are properties owned by some of intervenor's members, and there is a municipal boat ramp and boat slip area near the inland limit of the Westecunk Creek.

The western boundary of Lot 2.01 ends in a salt marsh that floods during each high tide. The eastern boundary "grades gently to a sharp bay shore line" into Little Egg Harbor. Until 2016, the interior of Lot 2.01 was overgrown by a variety of trees and common reed grass that was "seasonally mowed." To the west and south of Lot 2.01 are portions of the United States Fish and Wildlife Service's Edwin B. Forsythe Wildlife Refuge.

7

Located on Lot 2.01 is the West Creek CDF, which was originally constructed in 1966. The CDF had been used for the management of dredged sediment from the maintenance dredging of Westecunk Creek in 1966, 1972, and 1983. A CDF is designed to allow the sediment in the slurry from dredge spoils to settle and the liquid to drain back into the waterway. When the material is sufficiently drained, the dried dredged material can be used to increase the size of the CDF's berms or can be removed with trucks and used for other purposes.

The Army Corps had authorized the 1966 and 1972 dredgings of Westecunk Creek, which occurred before the DEP assumed jurisdiction over such activities. The 1983 dredging project was jointly authorized by the DEP's Division of Coastal Resources and the Army Corps.

Private entities had owned the property on which the CDF was located during each of these past dredging events. In December 1982, the property's private corporate owner, Raymond Rosen & Co., granted the DEP's Bureau of Coastal Engineering ("BCE") a one-year, one-time easement "for the use and purpose of depositing spoil and all material excavated, dug, or dredged from the Westecunk Creek together with . . . the right to deposit and leave thereon sand, clay, gravel and other earth material." The easement also gave BCE the

8

ability to excavate ditches, and build and replace retaining embankments or walls, sluiceways, and spillways.

Thereafter, on January 5, 1983, the DEP's Tidelands Resource Council issued a blanket revocable license to the BCE for a term of five years to dredge an area of land under the State's existing navigational channels and to place the dredged material on State-owned or State-claimed disposal sites or other sites that were privately owned or claimed.

In March 1983, the DEP's Division of Coastal Resources issued to the BCE a five-year WFD permit to "[m]aintenance dredge an existing navigational channel in Westecunk Creek." According to that permit, "[a]pproximately 52,000 cubic yards of materials are to be dredged . . . . The dredged spoils are to be deposited at a previously used disposal area identified as Block 1, Lot 2 in Eagleswood Township." The project plans showed that the dredged quantity would be 52,233 cubic yards ("cy") and the "typical dike" or berm would be between a minimum of six feet and a maximum of seven feet. A discharge pipe would be installed from the eastern berm to drain the liquids back into the waterway.

In January 2000, the OMR and all of its functions, powers, budget and personnel were transferred from the DEP to the DOT.

9

Two years later, in January 2002, the DEP and the DOT entered into a Memorandum of Agreement ("MOA") to "develop, implement and maintain a comprehensive dredging and dredged material management and disposal plan for the navigable waters of the State . . . ." The MOA provided the DEP with funding to dredge "existing State navigation channels[,] including dredged material disposal, siting and purchase/lease of dredged material disposal sites, beneficial use projects, testing of material, and removal of hazards to navigation."

In 2005, the DEP met with local residents and township officials to discuss dredging the Westecunk Creek. Since 2000, the DEP had received hundreds of petitions seeking to have the Westecunk Creek dredged again to make it more navigable for its "variety of users, including fishermen, boaters, sportsmen and many local businesses which maintain their historic ties to the bay."

The DOT's Purchase of the Property and the PS&S Wetlands Study

In July 2006, the DOT purchased Lot 2.01 for $520,000.

In anticipation of renewed dredging activity, the State retained Paulus, Sokolowski and Sartor, LLC ("PS&S"), an engineering firm, to prepare a wetlands delineation report on Lot 2.01. In its February 2009 report, PS&S

found that the construction of dikes and past discharge of fill had altered the topography, vegetation, hydrology and soils on a majority of the site. The report stated the discharge of fill materials from several past dredging events had "compressed the original organic soils of the site and increased the elevation from one to five feet above the adjacent marsh and isolated the majority of the site from regular tidal inundation." Nevertheless, PS&S was able to delineate the wetlands boundary "by changes in soil texture, depth to groundwater and changes in the vegetation patterns," and "noted that the transition from wetlands to uplands occurred gradually over a broad transitional area." The report stated that "[d]uring one site visit near high tide, no surface water was observed and ground water ranged from 0.75 to approximately 2 feet below the ground surface."

PS&S explained in the same report that during a second inspection, "most of the site below elevation 2.2 feet was inundated at high tide." Thus, the report concluded that "[i]t is likely that nearly all of the site, except for the higher elevations of the dikes, is inundated or saturated for at least a short period during most years." The study substantiates the degree of erosion that has occurred since 1983.

11

In 2010, the BCE filed WFD and FWWGP1 applications to conduct maintenance dredging of the Westecunk Creek to improve navigability and to renovate the West Creek CDF to maintain the dredged material. Its proposed plan was to dredge 138,862 cy from the Westecunk Creek and "rebuild" the CDF on Lot 2.01 over 150 days with twelve-foot maximum height berms to hold approximately 225,000 cy of dredged spoils.

In response to BCE's permit applications, in September 2010, Clean Ocean Action ("COA"), an environmental coalition advocating for "environmentally-sound beneficial use of dredged material," submitted a report to the DEP with its conclusions about the project proposal. COA asserted that the requirements for the freshwater wetlands general permit were not met and that previous authorization for the project was "outdated and deficient." COA noted the absence of any "specific requirements for the design, construction, operation and maintenance, or interim/final closure of the CDF to prevent adverse impacts to natural resources or public health." Reflecting upon all three historical dredging events on the property, COA stated that

> the CDF should contain over 76,400 cubic yards (CY) of dredged material from 1972 and 1983 dredging events, plus an additional, unspecified portion of the 100,000 CY generated during a 1966 dredging event.

The current elevation inside the 26-acre CDF, however, is only ~3 feet, suggesting a discharge of dredged material into the adjacent environment.

Communications with the Army Corps

In October 2010, the Army Corps requested additional information on the BCE's proposals to conduct maintenance dredging in both Westecunk Creek and Parkers Run, a nearby waterway in Little Egg Township. The BCE told the Army Corps that only the portion of Parkers Run adjacent to the municipal properties and boat ramp would be dredged because "[t]he proposed CDF does not have sufficient capacity to store the volume of material anticipated from simultaneously dredging the entire Parkers Run channel." The BCE continued:

> [t]he two channels have not been dredged since 1983 due to monetary constraints. Currently, the Bureau of Coastal Engineering (BCE) has an existing Memorandum of Agreement (MOA) with the New Jersey Department of Transportation (NJDOT), who now funds dredging projects, to receive an annual appropriation for the funding of navigational dredging projects. This office is requesting a ten year maintenance dredging permit for both channels, in the event that additional maintenance dredging is required within that timeframe . . . .
>
>     . . .
>
> In the past, shoaling of these channels has been irregular, necessitating dredging from six to eighteen

13

years between dredging events. If a ten year maintenance dredging permit was issued, this office estimates up to one additional dredging event through the life of the permit.

As to the Army Corps' question about "why the CDF was not maintained," the BCE responded:

This office has no knowledge of what property maintenance activities were conducted by the prior owners. Aerial photography indicates that the vegetation had been mowed prior to state ownership. The CDF was last used for a state dredging project in 1983. A standard disposal agreement with the property owner was used. Over the years, this office has not received the funds to continue dredging nor perform maintenance on the site. In approximately 2002, through the enclosed MOA, this office began using NJDOT funds for all state dredging projects conducted by this office.

Sometime in 2003 or 2004, this office started receiving inquiries into the dredging of Westecunk Creek. With funding available, this office contacted the property owner with the intent of purchasing this site to ensure the availability of the site for future dredging operations required to provide safe navigation.

In conversation with the property owner it appeared there was interest to develop the site as residential development. It was our understanding there were no pending permit applications for the site, though potential developers had contacted the Land Use Regulation Department regarding development on the site. Rather than enter into a one time use disposal agreement with the property owner, potentially

14

changing the characteristics of the site, <u>this office in conjunction with NJDOT purchased this property to ensure the continued availability of this disposal site for the life of the existing navigation channel. The use of this site as a confined disposal facility has never changed nor been interrupted</u>.

[(Emphasis added).]

As to the Army Corps' question about whether the CDF was "an active disposal site and not abandoned," the BCE stated:

> This office has never considered this CDF as abandoned. Also, the lack of dredging funds does not constitute abandonment. A portion of every Westecunk Creek dredging event has been disposed of in this disposal site. Use of this site for this upcoming dredging is continued use. The property has not been used, nor permitted, for any activity other than a disposal facility. NJDOT purchased this property specifically for the continued use as a disposal facility.

The BCE also assured the Army Corps it had ruled out alternatives to its proposal, stating:

> <u>Hydraulic dredging is . . . the only feasible method for dredging these areas</u>. Mechanical dredging would be much more time consuming and costly to be practicable, and pose the potential for a much larger negative environmental impact.
>
>      . . .
>
> The only method of dredging which would not require the use of a CDF would be side cast disposal into open

15

waters or onto the adjacent marsh.  Material side cast into Westecunk Creek would quickly be re-deposited directly into the channel, necessitating more frequent dredging.  Material side cast outside of Westecunk Creek would have a great impact on critical wildlife habitat.  <u>Material free pumped onto the adjacent marsh would cause a much larger negative environmental impact to a much greater area of wetlands</u>.

[(Emphasis added).]

<u>The June 2011 Public Hearing</u>

The DEP conducted a public hearing in June 2011 for comments on the BCE's then-pending permit applications.  At the hearing, one commenter noted that the original twelve-foot-high berms built in the 1980's on the north, south, and west side of the property were now between two and five feet high, and the berms on the east side of the property no longer existed.

In July 2011, the BCE advised the Army Corps that "[a]t this time, the CDF is going to be strictly used as the disposal site for Westecunk Creek and Parkers Run," unless channels within a four-mile radius needed dredging and had no closer CDF sites for disposal.  Also, the BCE expressed no plans to use the dredged material once dried.

<u>The October 2011 WFD Permit and Its 2016 Termination</u>

In October 2011, the DEP's Office of Dredging and Sediment Technology issued the BCE a combined WFD permit and FWWGP1

A-5525-17

conditionally authorizing a "[o]ne-time maintenance dredging event" of the Westecunk Creek of approximately 138,862 cy of sediment via hydraulic pumping. This would result in the loss of seven acres of freshwater wetlands. The permit also authorized "[r]enovation of the existing confined disposal facility using dredged material presently contained within the CDF to reestablish the existing berms and reconstruct the eastern-most berm to an elevation of twelve feet." The "special conditions" attached to the permit included the requirement that "[a]ll temporary dredging pipeline and CDF outfall pipes must be removed within sixty (60) days of termination of discharge from the CDF."

Ultimately, the 2011 permit was "terminated for cause" in April 2016 due to the State Executive Branch's reorganization after Superstorm Sandy. Relevant here, the State-conducted channel maintenance dredging program was transferred from the DEP's BCE to the DOT's OMR, "but the permit was not transferred" and would "not be used," resulting in a termination of the permit. Thus, no work under that permit occurred.

Nevertheless, in February 2015, before the 2011 permit's termination, the DEP's Tidelands Resource Council approved a blanket revocable dredging

17

tidelands license to the DOT's OMR to dredge land under State tidelands for twenty-four years from May 2014 to May 2038.

The DOT's Bulldozing Activities in 2016

In March and early April 2016, the DEP received numerous complaints of a bulldozer operating in the wetlands on Lot 2.01, clearing the site and disturbing nesting ospreys. The DEP's Bureau of Coastal and Land Use Compliance and Enforcement ("the BCLUCE") investigated and found that the vegetation consisting of common reed grass had been cleared along all of the berms and pathways bisecting the CDF. The DOT admitted it had undertaken "geotechnical investigation and site clearing" at the CDF property, believing its actions to be authorized under approved statewide general permits for geotechnical investigation and the maintenance of existing facilities. Based on its initial inspections, the BCLUCE agreed, and advised the DOT, to complete its activities by April 15, 2016, so as not to disturb the observed nesting ospreys near the CDF.

However, upon further review, the BCLUCE determined that the DOT's clearing activities were not authorized under the issued permits but nevertheless, after a site inspection on June 30, 2016, closed the incident report without further action requiring restoration. The BCLUCE found that

the cleared areas had "naturally re-vegetated" with the dominant onsite vegetation, common reed grass "and to the extent that trees were removed, the existing trees on the site will reseed and reestablish new trees without the need for planting . . . [and] NJDOT's activities did not disturb the onsite osprey nest and fledgling osprey were observed in the nearby nest." The BCLUCE warned that any future development the DOT planned to undertake would need to be properly permitted.

The Subject Permit Applications

In June 2016, the DOT's OMR applied to the DEP for a WFD individual permit and a WQC to dredge three waterways: Westecunk Creek in Eagleswood Township, Parkers Run in Little Egg Harbor Township, and Cedar Run in Stafford Township. The stated purpose of the DOT's dredging project was to "restore navigation to authorized depths throughout the channel," with the dredged material "proposed to be placed at the West Creek CDF." The DOT's application contained proofs of public notice, project location maps, site plans, a compliance statement addressing the applicable regulations, a sampling report for the dredged material, and a license concerning the DOT's authority to dredge the waterways.

19

In August 2017, the DOT submitted a data request to the DEP's Division of Parks & Forestry seeking information concerning the state and federal threatened and endangered plant and animal species on the property. After searching various databases, the National Heritage Program in the DEP's Office of Natural Lands Management found evidence of nesting ospreys, wintering bald eagles, and numerous types of other birds foraging on the property, which the State also classified as threatened, endangered, or of special concern. The same was true in the immediate vicinity of the property, within one mile of the property, and one mile from the property.

In February 2018, in connection with its dredging project, the DOT's OMR applied to the DEP for a combined FHA permit and an FWWGP1 to rehabilitate the West Creek CDF and store the dredged materials on Lot 2.01. In the statement of compliance attached to the application, the DOT stated that there was not an outfall pipe on the site and that the berms had been reduced to between four and seven feet and, in some waterfront areas, the berms had been completely destroyed by storms and tidal erosion. The DOT planned to "rehabilitate" the berms with dredged material found in the CDF from its last use up to a height of fifteen feet and install an outfall pipe to discharge water from the dredged material slurry deposited into the CDF. The DOT also

20

included topographic maps, site photographs, correspondence regarding wildlife and wildlife habitat, proofs of public notice, and site plans in its permit application.

Objections to the DOT's Permit Applications and the Lee Report

In the spring of 2018, appellants and their counsel submitted written public comments to the DEP opposing the DOT's applications. Counsel complained that an FWWGP1 should not be issued because (1) there is not an "existing" CDF already at the site, and in turn there is not a "currently serviceable" facility, which is a prerequisite to obtaining the permit; (2) there would be unacceptable impacts on threatened and endangered species; (3) the DEP failed to consider several alternative locations to store the dredge spoils; and (4) the neighboring residences would suffer from noise, odors, dust, pollution, and truck traffic.

Attached to one of the objectors' counsel's letters was an expert report dated July 25, 2016, by Lee and Associates (the "Lee Report"), which concluded that "there is no 'existing CDF' at the West Creek site." The Lee Report found, based on review of the record, the Army Corps' published maintenance and closure standards for CDFs, and a site visit, that the West Creek CDF was not an existing, serviceable facility, as required by an

21

FWWGP1. The report listed many characteristics of an existing, serviceable CDF, including berms that are sufficient to retain material; adequate roads for operation, maintenance, and removal of material; natural features to protect groundwater; and buffer lands to prevent dust, noise, odors, and pollution from affecting nearby properties and wildlife. Additionally, the report further stated that Army Corps and the DEP guidance documents required CDFs to have approved closure plans, which included maintenance and reporting, to ensure that potentially contaminated material remained confined.

The Lee Report asserted that many of the necessary characteristics of an existing CDF were missing from the West Creek CDF. For example, the berms had eroded, with trees growing in their places. In addition, there were not adequate measures in place to block public access to the site or protect wildlife from being contaminated by the deposited sediments. Further, the report noted that, because the West Creek CDF had no closure plan and none of its owners had ever submitted maintenance or other reports for this deteriorated facility, no CDF existed on Lot 2.01.

In March 2018, the DEP's staff issued a threatened and endangered species habitat report reviewing the CDF project, which recommended precautions to protect a nearby osprey nesting habitat from potential

A-5525-17

disturbance by prohibiting work at the site from April 1 through August 31 of each year.

Phases I and II

On May 1, 2018, the DOT emailed the DEP verifying the West Creek CDF's capacity and outlining the two planned phases of construction. The email stated:

> The plan is to build the CDF up in two phases.
>
> Phase I will use existing material on site to construct berms to a height of +10.75' NAVD88.[1] This will generate 146,850 CY of air capacity. Assuming a bulking factor of 1.3, this would give us approximately 113,000 CY of in situ capacity. Once this has been placed, the material would be allowed to drain and dry for some period of time until it becomes workable with standard equipment.
>
> Phase II will use the newly dewatered material to raise the berm elevation to a height of +20.0' NAVD88. This will generate 289,770 CY of additional air capacity. Assuming a bulking factor of 1.3, this would give us approximately 222,900 CY of in situ capacity.
>
> This approach generates a total of approximately 335,900 CY of in situ capacity. The currently

---

[1] NAVD88 means "North American Vertical Datum of 1988" and is used to measure vertical positions, i.e., elevations, throughout the United States as established by the National Geodetic Survey. United States v. Sweeney, 483 F. Supp. 3d 871, 920 n.49 (E.D. Cal. 2020).

> proposed round of dredging will remove 262,300 CY
> if the entire footprint is dredged to project depth.
>
> This analysis illustrates that there is ample capacity at
> the West Creek CDF to handle the proposed dredging.

Later in May 2018, the DEP's staff issued an engineering report finding the CDF project met the rules enforcing the Flood Hazard Area Control Act ("FHACA"). The report recommended approval of the project with conditions—such as installing sediment barriers and soil erosion control measures prior to beginning any work, in addition to prohibiting the storage, staging, or operating of construction equipment in any channel, wetland, or transition area.

The Revised CDF Plan

Responding to the public comments, the DOT revised its proposed CDF plan in June 2018 by reducing the proposed final berm height from +20.0' NAVD88 (twenty feet) to +15.0' NAVD88 (fifteen feet), and changing the construction access to further avoid potential adverse effects on the adjacent residential neighbors, Green Acres property, wetlands, and riparian zones.

On June 27, 2018, the DEP issued a WFD environmental report, finding that the CDF project met the applicable regulations but certain conditions were needed. Those conditions included prohibiting dredging shellfish lease areas,

prohibiting dredging from January 1 to June 30 to protect migrating anadromous fish species and winter flounder, protecting submerged aquatic habitat by floating the dredge pipeline above such habitat, and mandating a twenty-four-hour hydraulic retention time to allow for the settling of dredged material to minimize water quality impacts. The DEP's staff also issued an FHA Permit Environmental Report, finding that the CDF project met the FHACA rules at N.J.A.C. 7:13 with similar conditions required as listed in the WFD Environmental Report.

The June 2018 FHA and WFD Permits

On June 27, 2018, the DEP issued an approved FHA permit and verification for the revised CDF project and a WFD permit with a WQC for the dredging project,[2] incorporating into the permits its staff's recommended conditions listed in the environmental reports. Reconstruction of the CDF would result in the disturbance of 7.457 acres of freshwater wetlands that had formed on the interior of the CDF since 1983, and the temporary disturbance of 0.299 acres of freshwater.

In July 2018, the DEP met with appellants and other neighboring residents to discuss their concerns. Thereafter, the DEP received additional

---

[2] Appellants do not contest the WFD dredging permit, and limit their appeal to the permits concerning the CDF.

25

comments from appellants' counsel and two environmental groups objecting to the CDF project.

The December 2018 Issuance of the FWWGP1 and WQC Permits

On December 17, 2018, the DEP issued an FWWGP1 and WQC to the DOT for the CDF project, together with the staff's recommended conditions mandating construction activities within the facility footprint, prohibiting the use of heavy equipment near osprey nests between April 1 and August 31, prohibiting the use of heavy equipment outside of business hours on weekdays, scheduling inspections twice daily, and directing control measures for odor and dust.

The DEP also published its responses to the numerous public comments it received concerning the CDF project. In response to contentions that the dredged material was not suitable for reconstruction of the CDF, the DEP found that the existing material on the site had been evaluated for geotechnical suitability for use in construction of berms, and was consistent with the Army Corps' requirements. The DEP found no evidence of a berm failure and noted that the CDF would be inspected at least twice daily during the proposed activities.

As to alternative locations for disposal of materials from the dredging project, the DEP confirmed that the West Creek CDF was centrally located to the channels and close enough so that a small diameter hydraulic pipeline dredge could be used during the dredging. It deemed the site "the least cost environmentally acceptable alternative," and found no other State-owned available CDF facilities within a five-mile radius.

Furthermore, the DEP found that the project will not have an adverse impact on endangered or threatened wildlife, plant species, or critical wildlife habitats so long as specific measures were implemented, including a seasonable prohibition on the use of heavy equipment within 300 meters of an occupied osprey nest.

The Present Appeals

Appellants, a group of local residents on Dock Road and two environmental organizations, the New Jersey Conservation Foundation and Environment New Jersey, filed the present appeals respectively in August 2018 and in January 2019. The appeals have been consolidated. Appellants' arguments are supported by an advocacy group as amicus curiae, Save Barnegat Bay ("SBB"). Respondents are the DEP and the DOT. They are

27

supported by an intervenor group, Westecunk Creek Association, who advocates for navigation and boating in the local waterways.

While the appeals were pending, appellants moved twice before this court pursuant to Rule 2:9-5 in March 2021 and in August 2021 for an emergent stay of the reconstruction of the CDF, pending appeal. Both applications were denied. After we denied the second emergent application in August 2021, appellants sought relief from the Supreme Court. The Court remanded the stay request to be addressed in the first instance by the DEP Commissioner.

On September 14, 2021, the DEP Commissioner issued a thirteen-page order denying the emergent stay request. Thereafter this court denied the stay once more, but scheduled a prompt oral argument on the merits. No further Supreme Court review has occurred.

According to representations made to us at oral argument, Phase I of the project is still ongoing but must halt on or before December 31, 2021, due to conditions in place to protect wildlife habitats.

As a preliminary matter, we address the argument of appellants and SBB that the CDF project is invalid because the DEP did not issue a permit under the Coastal Area Facility Review Act ("CAFRA"), N.J.S.A. 13:19-1 to -21. In particular, the objectors contend such a CAFRA permit is necessary because the present CDF project enlarges what is known as the "footprint of development" of the structure built and approved under the 1983 permit. This argument fails, for the reasons that follow.

The Legislature enacted CAFRA in 1973 "to protect the unique and fragile coastal zones of the State." In re Egg Harbor Assocs. (Bayshore Ctr.), 94 N.J. 358, 364 (1983). Except for certain activities expressly exempted, CAFRA mandates that any proposed development within a coastal area that meets certain construction and development thresholds must obtain a permit from the DEP before commencing construction. In re Protest of Coastal Permit Program Rules, 354 N.J. Super. 293, 310 (App. Div. 2002) (citing N.J.S.A. 13:19-5, -5.2, and -5.3).

The DEP executes its CAFRA authority through the Coastal Zone Management ("CZM") Rules at N.J.A.C. 7:7-1.1 to -29.10. These regulations contain "the procedures for reviewing coastal permit applications" and "the

A-5525-17

substantive standards for determining development acceptability and the environmental impact of projects for which coastal permits are submitted." Protest of Coastal Permit Program Rules, 354 N.J. Super. at 312. The DEP also uses the CZM Rules to evaluate coastal wetlands permits, waterfront development permits, and water quality certificates. N.J.A.C. 7:7-1.1.

Before the 2016 permits were terminated, the DEP responded to the public's comments by stating that the CDF project proposed at that time did not require a CAFRA permit because the renovation of a pre-existing CDF that remains within its previous boundaries was not "development" as defined under CAFRA or its implementing regulations. The DEP explained:

> The proposed renovation of the Eagleswood Township CDF will remain entirely within the "footprint of development" of the pre-existing CDF and, in fact, will have a reduced "footprint of development" from the prior CDF use. The renovation of the CDF will involve using dredged material presently within the CDF to strengthen and raise the three existing berms (to the north, south, and west) to an elevation of twelve feet NAVD88. This dredged material also will be used to reconstruct the eastern-most berm, which has been destroyed by storm events and erosion since the last use of the CDF. This berm will be reconstructed westward of its previous location to provide a 50-ft buffer between the CDF and the bay and will thus be reconstructed within the previous footprint of development . . . . The renovation of the CDF also will involve the re-construction of the weir box within the interior of the CDF and will not change

> the footprint of the structure. <u>Thus, a CAFRA permit
> is not required for the renovation of the CDF</u>.

[(Emphasis added).]

Thereafter, although the DEP did not specifically mention "CAFRA" in its responses to the public's comments on the 2018 permits at issue, it used the same reasoning and essentially referred to the statute when it concluded in its 2018 Flood Hazard Area Permit Environmental Report that "[t]he project consists of reconstruction of an existing CDF within the same footprint" and that "the rehabilitation and use of an existing dredged material management area within the same existing footprint is <u>not</u> considered 'development'" pursuant to the CZM Rules. Thus, even if the DEP did not specifically mention CAFRA, it essentially told the public, as it told the DOT, that it had concluded the current CDF project was not subject to CAFRA's permitting requirements.

The objectors argue on appeal that a CAFRA permit is required for the CDF project because the proposed CDF is clearly an enlargement of the long-abandoned 1983 site and that its "footprint" will increase because under the new permits, the CDF is planned to be greater in height and volume than the CDF under the 1983 permits. With regard to height, the new berms will be up to fifteen feet high as opposed to the berms built under the 1983 permit, which

31

were six to seven feet high. Next, they argue the volume of the dredge spoils placed in the berms is exponentially greater than the volume under the original 1983 permit because the CDF will hold dredged materials from three, not one, waterways. The berms accordingly have increased capacity to hold more dredged material. The CDF under the 1983 permit held approximately 52,000 cy, whereas the CDF under the new permits is expected to hold approximately 350,000 cy—a volume almost seven times greater.

The objectors also complain that there is no pre-existing CDF, because it was never maintained, the former owners tried to develop Lot 2.01 for other uses, the 1982 easement was limited to a one-time use, and the historical deeds identified the land as "vacant."

In response, the DEP maintains that the CZM Rules clarify that the "rehabilitation and use of an existing dredged material management area within the same footprint" is not "development" pursuant to CAFRA and the CZM Rules.

The term "development" is statutorily defined by CAFRA as "the construction, relocation, or enlargement of any building or structure and all site preparation therefor . . . and shall include . . . public development." N.J.S.A. 13:19-3. One exemption from having to comply with CAFRA's

32

permitting requirements is when "[t]he enlargement of [a] development . . . does not result in . . . the enlargement of the <u>footprint of the development</u>." N.J.S.A. 13:19-5.2(c) (emphasis added).

As the parties correctly point out, N.J.A.C. 7:7-1.5 of the CZM Rules likewise defines "development" as:

> [A]ny activity for which a coastal wetlands permit, waterfront development permit, or Federal consistency determination is required, including site preparation and clearing. <u>Development for an application under CAFRA</u> means the construction, relocation, <u>or enlargement of the footprint of development</u> of any building or structure and all site preparation therefor, the grading, excavation, or filling on beaches and dunes, and shall include . . . public development. Development under CAFRA and the Waterfront Development Law does not include repairs or maintenance such as replacing siding, windows, or roofs, unless such repairs or maintenance are associated with enlargements which are not exempt under CAFRA . . . or the Waterfront Development Law . . . . Development under CAFRA does not include debris removal or cleanup provided such activities do not involve excavation, grading, or filling on beaches and dunes.
>
> [(Emphasis added).]

N.J.A.C. 7:7-2.2(b)(13)(iii) further states that "[d]evelopment is not . . . [t]he rehabilitation and use of an existing dredged material management area <u>within the same footprint</u>." (Emphasis added).

33

Although the definition is not cited in the briefs, N.J.A.C. 7:7-1.5, which appears in the CZM regulations under CAFRA, defines the phrase "footprint of development" as "the vertical projection to the horizontal plane of the exterior of all exterior walls of a structure." N.J.A.C. 7:7-1.5.[3]

At first blush, this definition of a "footprint" conceivably could encompass height because it uses the words "<u>vertical</u> projection." <u>Ibid.</u> (emphasis added). However, as the Attorney General persuasively explained at oral argument, that the vertical aspect of a footprint in this context concerns only a "projection" from the structure's base. The projection is used to ascertain, from a bird's eye view, whether a horizontal cross-section of the structure at any point in its elevation is wider than its base.[4] For instance, if a

---

[3] The DEP originally adopted the term "footprint of development" in 2008 as a definition in N.J.A.C. 7:7E-1.8, 40 N.J.R. 1836(a) (Apr. 7, 2008), but recodified that regulation to N.J.A.C. 7:7-1.5 in 2015, as part of its effort to consolidate the Coastal Permit Program Rules and the CZM Rules. 47 N.J.R. 1392(a) (July 6, 2015).

[4] In an illustrative administrative law decision, <u>Fay v. N.J. Dep't of Env't Prot.</u>, No. ELU-CA 706-09, 2011 WL 3305404, at *1 (Feb. 8, 2011), homeowners wanted to expand their single-family home and build a new deck. The DEP denied their CAFRA permit application because the property was located on a dune. <u>Ibid.</u> In upholding the agency's denial, the Administrative Law Judge found that the property has a "footprint" of "980 square feet." <u>Ibid.</u> The homeowners' expert admitted that, as an alternative to expanding the home to cover more of the dune, "the dwelling could be reconstructed and expanded vertically within the existing footprint." <u>Id.</u> at 6. This is consistent with the

hypothetical homeowner within the freshwater wetlands area constructed a deck on the third story of her home that was wider than the home's horizontal base on the first floor, such an overhanging deck would presumably be outside of the "footprint."

We adopt this reasonable interpretation of the term. It is consistent with a common understanding of the term "footprint" in other building and land use contexts. That common understanding conceives of a footprint as being two-dimensional in nature, representing the horizontal area of the base of the structure. This horizontal, two-dimensional attribute is expressed in both statutes and regulations[5] and in case law.[6]

---

DEP's contention here that a vertical expansion of a structure does not enlarge the "footprint of development." We have cited Fay to show that consistency, and we have not cited the case as precedential authority. See R. 1:36-3.

[5] See, e.g., N.J.S.A. 13:18A-5.1(b)(3) (stating that to obtain approval for one's application for reconstructing or expanding a single family dwelling within five years of its deconstruction or demolition, one must prove "the foundation of the demolished . . . dwelling . . . will constitute the footprint of the improvement or reconstruction"); N.J.S.A. 4:1C-32.1(g) (explaining a condition of the use of land or structures for a special permit for rural microenterprise activity is that the expansion of the existing building space must not exceed 500 square feet in total footprint area); N.J.A.C. 7:7-15.2(f)(2)(iv)(6) (permitting development on a dune that contains a deck, patio, or porch without compliance with the usual dune rules if, among other things, "the footprint of development of the deck, patio, or porch enclosure does not exceed 400 square feet"); N.J.A.C. 7:7-4.7(a)(7) (authorizing expansion of a residential development parallel to the mean high water line if,

For this reason, we reject appellants' claim that a CAFRA permit under N.J.S.A. 13:19-5.2(c) was required for the CDF because the horizontal "footprint of development" was not enlarged.[7]

---

among other things, the expansion "does not increase the surface area of the footprint of the development by a cumulative total of more than 400 square feet on the property");  N.J.A.C. 7:7-4.22(a)(3) (permitting the construction of a "swimming pool, spa or hot tub and associated decking" if, among other things, the footprint of the area on which there is already construction combined with the new construction does not exceed "750 square feet");  N.J.A.C. 2:76-23.6(a)(6)(i), (a)(7)(i) (requiring expansion of an existing personal wireless service facility or construction of a new personal wireless service facility to not "exceed 500 square feet in footprint area").

[6] See, e.g., Rumson Estates, Inc. v. Mayor & Council of Borough of Fair Haven, 177 N.J. 338, 347 (2003) (describing the proposed structure at issue in the case as a "two story single-family house with a 1,600 square foot footprint"); Mullen v. Ippolito Corp., 428 N.J. Super. 85, 97, 104-05 (App. Div. 2012) (holding that an objector sufficiently complained to the municipality that the defendant was expanding the physical "footprint" of his property by expanding the motel's fence and boardwalk area around the pool into the public boardwalk right of way); Heritage at Towne Lake, LLC v. Planning Bd. of Borough of Sayreville, 422 N.J. Super 75, 77 (App. Div. 2010) (noting land use applicant's testimony at a Planning Board meeting that "the building footprint will be the same, and the building elevations will be the same," implying elevation is not included in the footprint) (emphasis added); Dragon v. N.J. Dep't of Env't Prot., 405 N.J. Super 478, 483 (App. Div. 2009) (holding CAFRA did not give the DEP the power to allow a homeowner to expand the "size, height and footprint" of his home without issuing him a permit, distinguishing height from footprint) (emphasis added).

[7] Nevertheless, as we discuss in Part III, infra, that does not resolve the question of whether increases in height and volume are encompassed within the FWPA prohibition on "expand[ing]" a previously permitted structure. N.J.A.C. 7:7A-7.1(a)(2).

III.

As noted in our introduction, the pivotal issue in this appeal turns out to be the DEP's issuance of a General Permit and its failure to issue an Individual Permit under FWPA. To address that pivotal issue, some preliminary discussion about FWPA is necessary.

FWPA was enacted in 1987 and became effective on July 1, 1988. N.J.S.A. 13:9B-1 to -30. In passing that law, the Legislature

> determine[d] that in this State, where pressures for commercial and residential development define the pace and pattern of land use, it is in the public interest to establish a program for the <u>systematic review of activities in and around freshwater wetland areas</u> designed to provide predictability in the protection of freshwater wetlands . . . [and] that it shall be <u>the policy of the State to preserve the purity and integrity of freshwater wetlands from random, unnecessary or undesirable alteration or disturbance</u> . . . .
>
> [N.J.S.A. 13:9B-2 (emphasis added).]

FWPA divides freshwater wetlands into three designated categories: those of (1) exceptional resource value, N.J.S.A. 13:9B-7(a); (2) intermediate resource value, N.J.S.A. 13:9B-7(c); and (3) ordinary resource value, which includes detention facilities such as a CDF, N.J.S.A. 13:9B-7(b).

Generally, a permit under FWPA is required to conduct a regulated activity, including the "removal, excavation, disturbance or dredging of soil,

sand, gravel, or aggregate material of any kind" and the "dumping, discharging or filling with any materials," within a designated location. N.J.S.A. 13:9B-3. Two main types of freshwater wetlands permits are available: General Permits, N.J.A.C. 7:7A-5 and -7; and Individual Permits, N.J.A.C. 7:7A-9 and -10.[8]

FWPA authorizes the DEP to issue General Permits for specifically defined activities regulated within freshwater wetlands, without the need for the applicant to satisfy the more rigorous process required for Individual Permits. N.J.S.A. 13:9B-23. In this regard, N.J.S.A. 13:9B-23 states in relevant part:

> c. The [DEP] shall issue additional general permits on a Statewide or regional basis for the following categories of activities, if the [DEP] determines, after conducting an environmental analysis and providing public notice and opportunity for a public hearing, that the activities will cause only minimal adverse environmental impacts when performed separately, will have only minimal cumulative adverse impacts on the environment, will cause only minor impacts on freshwater wetlands, will be in conformance with the purposes of [FWPA], and will not violate any provision of the Federal Act:
>
> . . . .

---

[8] The DEP's regulations implementing FWPA provide for three other types of permits in N.J.A.C. 7:7A-2.1(b) that do not pertain here.

> (9) Maintenance, reconstruction, or repair of buildings or structures lawfully existing prior to the effective date of [FWPA] or permitted [FWPA], provided that these activities do not result in disturbance of additional freshwater wetlands upon completion of the activity.
>
> [N.J.S.A. 13:9B-23(c)(9) (emphasis added).]

A General Permit issued under N.J.S.A. 13:9B-23(c) automatically expires after five years unless the DEP reviews it within that time period, and then modifies or reissues the permit. N.J.S.A. 13:9B-23. "Review" includes "public notice and [an] opportunity for public hearing." N.J.S.A. 13:9B-23.

If an applicant's proposed activities do not qualify for issuance of a General Permit under one of the categories in N.J.S.A. 13:9B-23, an application can be submitted for approval under an Individual Permit pursuant to N.J.S.A. 13:9B-9 and N.J.S.A. 13:9B-13. See In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 335 (App. Div. 2005) (stating if a General Permit does not apply, the proposed regulated activities, "could still be approved under an [I]ndividual [P]ermit"); In re Authorization for Freshwater Wetlands Gen. Permits ("In re FWPA Authorization"), 372 N.J. Super. 578, 582 n.2 (App. Div. 2004) ("Compared to a [G]eneral [P]ermit, [I]ndividual [P]ermits require the applicant to meet more demanding standards

and requirements."). See also N.J.A.C. 7:7A-9.1 (stating "[a] person shall obtain an [I]ndividual [P]ermit . . . in order to undertake any activity that does not meet the requirements of . . . an authorization under a [G]eneral [P]ermit").

According to FWPA's implementing regulations, N.J.A.C. 7:7A-1.1 to -22.20, the type of activities that specifically qualify for a GP1are minor in scope. Therefore, they do not compel the intensity of DPE review that is required for issuing an Individual Permit. N.J.A.C. 7:7A-7.1(a).

Specifically, and critical to our analysis, an FWWGP1:

> authorizes activities in freshwater wetlands . . . required to carry out the repair, rehabilitation, replacement, maintenance, or reconstruction of a previously authorized, currently serviceable structure, . . . lawfully existing prior to July 1, 1988 . . . and:
>
> > 1. The previously authorized structure . . . or facility has not been and will not be put to any use other than as specified in any permit authorizing its original construction; and
> >
> > 2. The activities do not expand, widen, or deepen the previously authorized feature, and do not deviate from any plans of the original activity . . .
>
> [N.J.A.C. 7:7A-7.1(a)(1) and (2) (emphasis added).]

The regulation then adds the following important exception and proviso:

. . . except that <u>minor deviations due to changes in materials or construction techniques and which are necessary to make repairs, rehabilitation, or replacements</u> are <u>allowed, provided such changes do not result in disturbance of additional freshwater wetlands</u> or State open waters upon completion of the activity.

[Ibid. (emphasis added).[9]]

Citing these FWPA regulations, appellants and amicus SBB contend the CDF project was not eligible for an FWWGP1 for several reasons:

(1) there was no "currently serviceable" CDF on the site, as required by N.J.A.C. 7:7A-7.1(a);

(2) the CDF was not "lawfully existing," as required by N.J.A.C. 7:7A-7.1(a), and has been abandoned;

(3) the proposed CDF activities will "expand, widen, or deepen" the CDF authorized in 1983, which violates N.J.A.C. 7:7A-7.1(a)(2); and

(4) the project will threaten and cause significant and harmful impacts to the nearby residences and to the extensive threatened and endangered wildlife inhabiting the site.[10]

---

[9] The DEP amended N.J.A.C. 7:7A-7.1 in April 2021, but no changes were made to subsection (a). 53 N.J.R. 514(b), 522-23 (Apr. 5, 2021).

[10] In their emergent brief filed in September 2021, appellants argue for the first time that N.J.A.C. 7:7A-5.7(b)(1) explicitly prevents the use of a GP1 to

We address these contentions, and other related aspects of FWPA regulations, in turn. In doing so, we are cognizant that if any one of them is correct, the legal basis for a General Permit in this case under FWPA collapses and an Individual Permit is required.

Our interpretation and application of the pertinent regulations is guided by well-established principles. Regulations are given the effect of their plain language in the context of the entire regulatory scheme. J.H. v. R&M Tagliareni, LLC, 239 N.J. 198, 214 (2019) (citing Medford Convalescent & Nursing Ctr. v. Div. of Med. Assistance & Health Servs., 218 N.J. Super. 1, 5 (App. Div. 1985) (citation omitted)). Courts "cannot rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning." US Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012). Courts are required to interpret the regulation sensibly and not in a manner that leads to an absurd result. In re N.J.A.C. 12:17-2.1, 450 N.J. Super. 152, 166-67 (App. Div. 2017).

---

deposit dredge on wetlands. We are not required to review this newly raised argument that was not presented in their merits briefs, but even if we did, this argument is unavailing. Even though N.J.A.C. 7:7A-5.7(b)(1) declares that "[n]o material shall be deposited or dewatered in freshwater wetlands," it does not preclude an applicant, such as the DOT, from seeking a separate permit to authorize that activity, such as a GP1, which occurred here.

When interpreting a regulation, we are guided by the same general principles as we are when interpreting a statute. In re Eastwick College LPN-RN Bridge Program, 225 N.J. 533, 542 (2016); US Bank, 210 N.J. at 202. The main objective is to determine the intent of the drafter, which is most often found in the plain language of the regulation. In re Eastwick College, 225 N.J. at 542. If the plain language does not clearly manifest the drafter's intent, we are permitted to use extrinsic sources to determine the meaning. Ibid. (citing US Bank, 210 N.J. at 199).

A. "Currently Serviceable" Structure

Appellants and SBB contend the West Creek CDF was not a "currently serviceable" structure as required by N.J.A.C. 7:7A-7.1(a) because the project requires the DOT to construct the CDF "from the ground up" by excavating the base of the site in the initial phase to create the berms that had been already bulldozed. Respondents and intervenor disagree with that interpretation.

To begin, the West Creek CDF is a "structure." Although not defined in FWPA or its regulations, the term "structure" is instructively defined in the CZM Rules as "any assembly of materials above, on, or below the surface of the land or water, including, but not limited to, buildings, fences, dams, pilings, footings, breakwaters, culverts, pipes, pipelines, piers, roads, railroads,

and bridges, and includes floating structures."  N.J.A.C. 7:7-1.5 (emphasis added).  The berms that surround the CDF and hold the dredged material comprise such an "assembly of materials."

That said, there is no definition of a "currently serviceable" structure in FWPA or its implementing regulations, except as it applies to dams.  Although not mentioned by the parties, a dam regulation, N.J.A.C. 7:7A-7.18, provides criteria for a "GP18" permit authorizing dam repair, and likewise refers to what makes a dam "currently serviceable":

> (a) General permit 18 authorizes activities in freshwater wetlands, transition areas, and State open water as necessary for the repair, rehabilitation, replacement, maintenance, reconstruction, or removal of <u>a dam</u>, as defined in the Department's dam safety rules at N.J.A.C. 7:20-1.2.
>
> (b) A <u>dam that is currently serviceable</u> may be repaired, rehabilitated, replaced, maintained or reconstructed under general permit 18.  A <u>dam is considered currently serviceable if it meets any of the following criteria</u>:
>
> > 1. The dam is <u>in use, that is, the dam is impounding water at a normal pool elevation for which it was designed</u>, at the time of submittal of the general permit application;
> >
> > 2. The dam is not in use, and has been out of use for no more than five years prior to

submittal of the general permit application; or

3. The dam is not in use, but has been out of use for up to 10 years prior to submittal of the general permit application, but the applicant documents that public funding was actively sought for repairs during the 10 years.

(c) A <u>dam that is not currently serviceable</u>, as defined in (b) above, <u>may not be repaired, rehabilitated, replaced, maintained or reconstructed</u>, but may be removed.

[N.J.A.C. 7:7A-7.18 (emphasis added).]

The West Creek CDF, of course, is not a dam. Even so, applying analogous concepts of what is a "currently serviceable" structure, we conclude it was reasonable for the DEP to conclude the West Creek CDF is such a structure.

Although not mentioned by the parties, the Army Corps defines "currently serviceable" in the context of nationwide general permits ("NWPs") as "[u]seable as is or with some maintenance, but not so degraded as to essentially require reconstruction."[11]   Reissuance and Modification of

---

[11] The Army Corps issues NWPs to authorize activities under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act of 1899, where those activities will have minimal individual and cumulative adverse environmental effects. 86 Fed. Reg. 2744, 2875; 82 Fed. Reg. 1860, 2006.

Nationwide Permits, 86 Fed. Reg. 2744, 2875 (Jan. 13, 2021); Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. 1860, 2006 (Jan. 6, 2017). This definition is used, for example, to review an Army Corps' NWP3(a), which applies to maintenance of structures and authorizes:

> [t]he repair, rehabilitation, or replacement of any previously authorized, <u>currently serviceable structure or fill</u> . . . , <u>provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit</u> or the most recently authorized modification. <u>Minor deviations</u> in the <u>structure's</u> configuration or filled area, including those due to changes in materials, construction techniques, requirements of other regulatory agencies, or current construction codes or safety standards that are necessary to make the repair, rehabilitation, or replacement <u>are authorized</u>. This NWP also authorizes the removal of previously authorized structures or fills. . . .
>
> [82 Fed. Reg. at 1984 (emphasis added).]

A federal NWP3 "only authorizes maintenance activities" of "repair, rehabilitation, or replacement." 82 Fed. Reg. 1879, 1984. By contrast, N.J.A.C. 7:7A-7.1(a) authorizes an FWWGP1 for "activities . . . required to

---

NWPs were first issued in 1977. Regulatory Programs of the Corps of Engineers, 42 Fed. Reg. 37122 (July 19, 1977). After 1977, NWPs were issued, reissued, revised, or expired every few years. 86 Fed. Reg. 2744, 2875; 82 Fed. Reg. 1860, 2006. In 1991, the provisions were relocated into an appendix to the Code of Federal Regulations, but were removed in 1997 and are now published only in the Federal Register. <u>Doyal v. N.J. Dep't of Env't Prot.</u>, 390 N.J. Super. 185, 191 n.2 (App. Div. 2007).

A-5525-17

carry out the repair, rehabilitation, replacement, maintenance, <u>or</u> <u>reconstruction</u>" of the structure. (Emphasis added). Hence, by adding the concept of reconstruction, the activities authorized by a FWWGP1 are broader than the ones permitted by an NWP3(a).

There is no evidence in the record that the CDF, even with its dilapidated, eroded, and bulldozed berms, has not continued to hold dredged material from 1983 and the prior dredgings. The CDF could reasonably be considered functional in that respect, although it apparently requires rehabilitation and reconstruction to safely accept and hold any newly dredged material. Therefore, if the CDF is holding dredged material but requires some reconstruction, repair, and maintenance to reach its full holding capacity, then it is considered currently serviceable, even if it has been dormant for some time.

We therefore reject appellants' argument that the West Creek CDF was not a "previously authorized currently serviceable structure" as required by N.J.A.C. 7:7A-7.1 to qualify for a GP1.

B. "Lawfully Existing" and Abandonment

Appellants and SBB next contend the West Creek CDF was not "lawfully existing" as required by N.J.A.C. 7:7A-7.1. They emphasize that

47

none of its former owners, nor its current owner, complied with the annual reporting mandates outlined in the DEP's October 1997 Dredging Technical Manual and Appendix G to the CZM Rules titled "The Management and Regulation of Dredging Activities and Dredged Materials in New Jersey's Tidal Waters," effective July 6, 2015. Moreover, the private property owners repeatedly attempted to develop the property, both residentially and commercially, which the objectors argue illustrates the CDF was not lawfully existing at, between, and after the times of those ventures.

Appellants and SBB further assert it does not matter that the word "existing" is not defined by FWPA or its implementing regulations, because there were no photographs or facts in the record showing that a CDF physically existed on Lot 2.01 when the DEP reviewed the DOT's GP1 application. Respondents and intervenor counter that the CDF manifestly "existed" when the DOT applied for the General Permit.

It is undisputed that the deposit of dredge spoils into the West Creek CDF was authorized under the permit issued in 1983. It is likewise undisputed that no dredge spoils have been deposited into the CDF after that activity.

N.J.A.C. 7:7A-7.1 states that the structure must be "previously authorized, [and]. . . lawfully existing prior to July 1, 1988." (Emphasis

added). Contrary to appellants' contentions, this language, when read plainly, concerns the legal status of the structure, not the extent of its physical condition. The word "lawfully" modifies the term "existing."

Appellants and SBB contend the lawful status of the CDF has lapsed under general principles of abandonment associated with the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-68. Under the MLUL, nonconforming uses or structures on a property existing at the time a zoning ordinance changes "may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof." N.J.S.A. 40:55D-68.

In S&S Auto Sales, Inc. v. Zoning Bd. of Adjustment for Borough of Stratford, 373 N.J. Super. 603, 613-14 (App. Div. 2004), a case where the use of the property as an automobile dealership enjoyed the status of a nonconforming use under the MLUL, we explained the concept of abandonment in that context:

> Abandonment of a nonconforming use terminates the right to its further use. The traditional test of abandonment requires the concurrence of two factors: (1) an intention to abandon, and (2) some overt act or failure to act which carries a sufficient implication that the owner neither claims nor retains any interest in the subject matter of the abandonment
> . . . .

. . . Temporary non-use does not constitute abandonment. A change in ownership or tenancy does not terminate a nonconforming use . . . nor does the temporary inability to find a new tenant.

. . . [T]he owner must demonstrate that the intention to continue the use is <u>a continuing and definite intention, which must be substantiated by all of the circumstances surrounding the cessation</u>. The owner bears the burden of proof by a preponderance of the evidence.

[(Citations omitted) (emphasis added).]

In <u>Villari v. Zoning Bd. of Adjustment of Deptford</u>, 277 N.J. Super. 130, 137 (App. Div. 1994), another case involving abandonment under the MLUL, we held that the landowners had abandoned the use of their land as a pig farm for up to fifteen years during which they used the land to grow corn and alfalfa and failed to maintain the fence or enclosed area "in any manner related to the raising of hogs or pigs." <u>Ibid.</u> In response to the landowners' contention that they always intended to resume pig farming on the property, we determined that "even if plaintiffs did not have an actual subjective intention to abandon the raising of pigs, we would sustain the [Land Use] Board's decision based on plaintiffs' prolonged cessation of that use." <u>Ibid.</u> Thus, the time of non-use must be considered, along with the "subjective intent to resume the conforming use." <u>Berkeley Square Ass'n, Inc. v. Zoning Bd. of Adjustment of Trenton,</u>

410 N.J. Super. 255, 268 (App. Div. 2009) (quoting S&S, 373 N.J. Super. at 624).

Here, appellants contend for several reasons that the West Creek CDF was abandoned long ago by its owners for any future use as a CDF. First, a former private owner developed a plan for residential and commercial uses, which evidences an intent to abandon the CDF. Second, the state coastal permit authorizing the deposit of dredge spoils into the CDF in 1983 was limited to a "one time only" disposal of approximately 52,000 cy dredged from the Westecunk Creek, and no deposits were ever made thereafter. Third, no owner "maintained" Lot 2.01 as a CDF, as evidenced from the disintegrated berms, the missing drainage pipe, and the dilapidated weir box. Fourth, if the DEP or the DOT had intended to preserve the CDF, the State would have recorded some interest in the property, instead of letting the one-year 1983 easement expire. Finally, none of the owners prepared an annual maintenance report updating the site's status and condition or identifying a five-year plan of projected activities, as appellants say was required by the DEP Dredging Technical Manual written in October 1997 and one of the appendices to the CZM Rules.

Initially, we note appellants' reliance is misplaced on whether the former CDF owners complied with mandatory reporting requirements in the DEP's 1997 Dredging Technical Manual or in Appendix G to the CZM Rules. FWPA provides that developments, such as the present one, which were approved by the Army Corps prior to the Act's effective date on July 1, 1988:

> which projects would otherwise be subject to State regulation on or after the effective date of this act, shall be governed only by the Federal Act, and shall not be subject to any additional or inconsistent substantive requirements of [FWPA]; provided, however, that upon the expiration of a permit issued pursuant to the Federal Act any application for a renewal thereof shall be made to the appropriate regulatory agency.
>
> [N.J.S.A. 13:9B-4(d)(3).]

Based on that statute, the reporting requirements cited by appellants would not apply to the CDF until _after_ the DOT applied to the DEP for a new permit.

The abandonment issue is being presented to us without the benefit of any reasoned analysis by the agency in its final agency decision.[12] Nor did the

---

[12] Before the present permits were issued in 2018, the question of abandonment did arise in earlier permit applications. In 2010, when BCE filed permit applications to conduct maintenance dredging of the Westecunk Creek, the Army Corps questioned whether the site was "an active disposal site and not abandoned." BCE responded that it has "never considered this [site] as abandoned." This exchange arguably suggests that the DEP's legal position on the alleged irrelevance of abandonment has not been consistent.

52

DEP Commissioner's September 14, 2021 decision denying appellants' emergent request for a stay pending appeal mention abandonment. Instead, respondents' briefs adopt a categorial position that abandonment, as it is understood under the MLUL and related case law, is irrelevant to DEP freshwater wetlands permitting. That is not entirely clear because the DEP has at times, albeit not in a GP1 context, looked to abandonment principles in its regulatory role.

We note in this regard the DEP has relied in the past on the MLUL's doctrine of abandonment to review permit applications, that is, specifically to review FHA permits. In Asdal Builders, LLC v. N.J. Dep't of Env't Prot., 426 N.J. Super. 564, 577 (App. Div. 2012), a civil penalty action, the DEP Commissioner used the abandonment doctrine to deny an after-the-fact stream encroachment permit. Although we did not reject the doctrine's conceptual applicability to a DEP permitting case, we did conclude that the Commissioner's determination the property was abandoned was incorrect on the facts presented. Ibid.

In addition, we note the concept of abandonment is found in FWPA, albeit for cranberry bogs, blueberry fields, and ongoing farming, ranching, or silviculture operations. In N.J.S.A. 13:9B-4(a), the Legislature exempts those

activities from the requirements of obtaining a freshwater wetlands permit.

For the purposes of explaining that particular exemption, N.J.S.A. 13:9B-4(f)

injects concepts of abandonment:

> For the purposes of the exemptions in subsection a. of this section, a cranberry bog, blueberry field, or portion thereof, on which any of the activities specifically pertaining to cranberry bogs or blueberry fields listed in that subsection has occurred within the prior five years shall be considered an established, ongoing farming operation, and shall not be deemed abandoned. The lack of a commercial harvest or production of a crop on or from the bog or field shall not be a determining factor as to whether the agricultural use has been abandoned.
>
> [N.J.S.A. 13:9B-4(f) (emphasis added).]

These exemptions relating to the abandonment of blueberry fields and

cranberry bogs are also found in FWPA's implementing regulations. N.J.A.C.

7:7A-1.3 states:

> "Abandoned" means, with respect to an agricultural field, including a blueberry field or a cranberry bog, that the field was used for agriculture, but has not been used to produce a crop or product, or maintained or improved for agricultural purposes, for five years or more. If an agricultural field has been abandoned for 40 or more years, it shall no longer be considered an abandoned agricultural field. The lack of a commercial harvest or production of a crop on or from a cranberry bog or blueberry field shall not be a determining factor as to whether the agricultural use has been abandoned.

[N.J.A.C. 7:7A-1.3 (emphasis added).]

N.J.A.C. 7:7A-1.3 adds that

> "Established, ongoing farming, ranching, or silviculture operation" [under this regulation] means activities on areas subject to a farming, ranching, or silviculture use as of June 30, 1988, which use has been pursued continuously since June 30, 1988. Activities on areas lying fallow as part of a conventional rotational cycle that does not exceed five years are part of an established operation. Activities that bring an area into farming, silviculture, or ranching use are not part of an established operation. An operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle for so long that modifications to the hydrological regime are necessary to resume operations, or for more than five years, whichever is shorter.

> A cranberry bog, blueberry field, or portion thereof that was used for such purposes as of June 30, 1988, and on which any of the activities listed at N.J.A.C. 7:7A-2.4(c)2 and 3 have occurred within the prior five years shall be considered an established, ongoing farming operation and shall not be deemed abandoned. The lack of a commercial harvest or production of a crop on or from the lands shall not be a determining factor as to whether the agricultural use has been abandoned.

> [Ibid. (emphasis added).]

These citations, coupled with the DEP's response to the Army Corps' query in 2010, undercut the DEP's legal argument that the doctrine of

abandonment is irrelevant to the issuance of a GP1 permit and has no bearing upon whether the CDF in this case was a "lawfully existing" structure when the DOT applied for that permit. Based on the apparent historical usage of the doctrine of abandonment by the Legislature and the DEP, the agency must consider the factual record anew and make an explicit, evidence-based current determination as to whether the West Creek CDF had been abandoned due to its long years of erosion, alleged lack of maintenance, and alleged return to its natural state after the 1983 dredging and disposal.[12]

Although we recognize the Attorney General's assertion in its brief on behalf of the DEP that appellants' claims of abandonment do not matter here, an agency's appellate brief is no place for it to rehabilitate its order. In re N.J.A.C. 7:1B-1.1 et seq., 431 N.J. Super. 100, 139 (App. Div. 2013).

---

[12] We do not consider the question of abandonment as synonymous with the previously discussed issue of whether the CDF is a "currently serviceable" structure. As we pointed out, supra, the latter term can encompass the historical uses of the structure and does not hinge upon the elements of abandonment. It is conceivable, for instance, that a CDF is "currently serviceable" in terms of its physical properties, but nonetheless had been abandoned by its owners by failing to use it for a prolonged period of time.

C.  "Expand, Widen, or Deepen"

Appellants and SBB contend the proposed activities for the CDF project will "expand, widen, or deepen" the CDF that had been previously authorized in 1983, and thereby violate N.J.A.C. 7:7A-7.1(a)(2).

The DEP argues in response that because the new plan does not expand the 1983 CDF's "footprint" under CAFRA, it does not "expand" the use of the 1983 CDF under FWPA.  That argument mixes apples with oranges.

Notably, in its undated responses to public comments concerning the proposed CDF, the DEP declared:

> Comment 1:
>
> Freshwater Wetlands General Permit No. 1 Applicability.  Several comments were received that reconstruction of existing confined disposal facility (CDF) does not meet the requirements of the Freshwater Wetlands General Permit No. 1 because the site has not been used in decades and there is no current CDF on site.
>
> Response:
>
> NJDEP has determined the project meets the requirements of the Freshwater Wetlands General Permit No. 1.  Maintenance dredging of the Westecunk Creek channel has occurred several times dating back to 1940 and most recently in 1983.  The CDF was constructed for dredged material management for the last three maintenance dredging events (1966, 1972, and 1983) and continues to serve

57

as a confined disposal facility and has not been put to any other use. <u>All reconstruction activities will take place within the footprint of the existing CDF. The CDF will not be expanded, widened, or deepened. The berms of the CDF will be reconstructed to an elevation of 15.0' NAVD '88, but the depth of the structure is limited to the previous elevation of the underlying coastal marsh.</u>

. . . .

<u>Comment 8</u>:

<u>CDF Berm Height and View Obstruction</u>. Several comments were received stating that the elevated CDF berms would obstruct the view of the adjacent properties.

<u>Response</u>: The reconstruction of the CDF is to occur in phases with the initial phase using dredged material presently contained within the CDF to <u>reconstruct the berms to an elevation of 10.75' NAVD 88. The second phase will reconstruct berms to an elevation of 15' NAVD 88. All reconstruction activities will take place within the footprint of the existing CDF. There are no specific height limitations under the General Permit No. 1 provided the CDF is not expanded, widened, or deepened</u>.

We discern critical shortcomings with the DEP's analysis reflected in these Responses. For one thing, the Responses' narrow focus on the fact that the reconstructed berms will not "widen" or "deepen" the CDF essentially ignores the regulation's additional broader term, "expand."

58                                                   A-5525-17

A substantial increase in the above-ground height and overall volume capacity of a structure would appear to comprise an "expan[sion]" of that structure. Enlarging the height and volume of a structure would seem to be included among the various ways in which it can "expand."

The term "expand," as used within N.J.A.C. 7:7A-7.1(a)(2), is not defined in the DEP's regulations. Nevertheless, a common-sense understanding of "expand" would not confine the term to increases in only width and depth, but also would embrace increases in other dimensions, such as height and volume. The definition of "expand" in Webster's II New College Dictionary 394 (1999) includes "[t]o increase the volume, size, or scope of . . . ." Otherwise, if height or volume did not matter, a property owner with a previously approved two-story building located in freshwater wetlands conceivably could avoid getting an Individual Permit when adding ten more stories and creating a massive tower, so long as the width of the building did not change.

A cardinal principle when interpreting a statute or regulation is to give meaning to each word within it. DKM Residential Props. Corp. v. Twp. of Montgomery, 182 N.J. 296, 307 (2005). We disfavor interpretations that result in words serving as mere surplusage. Ibid. Here, the regulation's inclusion of

the word "expand," along with the terms "widen" and "deepen," adds breadth to its dimension and meaning. Width and depth are specific, but not exclusive, measures of expansion. The absence of the terms "height" and "volume" from the regulation's listing of dimensional terms is not dispositive, given the inclusion of the all-encompassing term "expand," which logically covers width, depth, and height, and volume.

The pertinent FWPA regulation, N.J.A.C. 7:7A-7.1(a), disallows the issuance of a GP1 for activities that "expand, widen, or deepen the previously authorized structure." The word "feature" encompasses a "structure" such as a CDF. N.J.A.C. 7:7A-16.7, titled "Additional application requirements for an authorization under a general permit, for an individual permit, or for a transition area waiver," requires a GP1 applicant to submit a site plan with "[e]xisting features, such as lot lines, structures, land coverage, and vegetation . . . . " N.J.A.C. 7:7A-16.7(c)(4)(i) (emphasis added). Additionally, N.J.A.C. 7:7A–2.3 states that a permitted type of "normal property maintenance" is the "[m]aintenance of artificial features including the repair, rehabilitation, replacement, maintenance or reconstruction of any previously authorized, currently serviceable structure," again treating a structure as a kind of feature. N.J.A.C. 7:7A-2.3(b)(1)(i)(9) (emphasis added).

This leads us to conclude that the DEP's permit decisions are materially lacking in the necessary analysis to establish that the proposed CDF does not "expand" the CDF that had been approved and built in 1983.  We reject the DEP's contention that there is no expansion if the horizontal footprint does not expand.  These additional dimensions of height and volume, which go beyond a "footprint," must be considered when determining whether an "expan[sion]" occurred.   The matter must be remanded to require the Commissioner to reconsider the question.  On reconsideration, the DEP must provide a cogent and sufficient statement of reasons to justify why an almost seven-fold increase in volume and a more than two-fold increase in the height of the CDF berms does not represent an "expansion" of the structure disallowed by a General Permit and does not require an Individual Permit.

D.  "Any Use Other Than as Specified"

As a related concern under the terms of N.J.A.C. 7:7A-1(a), the DEP's final agency decision does not explain why the CDF facility "will not be put to any use other than as specified in any permit authorizing its original construction." N.J.A.C. 7:7A-1(a)(1).  A proper application of the regulation in its entirety requires this analysis.  The objectors assert that the DOT's plan to convert the CDF into a regional CDF will improperly go beyond the use of the CDF under

61

the 1983 permit, which was limited to a one-time easement to deposit a modest amount of dredge spoils.

The 1983 permit authorized the CDF to be used for holding dredging spoils from only one waterway, i.e., the Westecunk Creek. The present project is designed to accept dredged material from two additional waterways, i.e., Parkers Run and Cedar Run. The propriety of these additional "uses" also must be addressed on remand by the Commissioner.

E. "Minor Deviations," "Changes in Materials or Construction Techniques," and No "Additional Freshwater Wetlands Disturbances"

As we have already noted, N.J.A.C. 7:7A-7.1(a)(2) disallows a GP1 if the activities "deviate from any plans of the original activity, except that minor deviations due to changes in materials or construction techniques and which are necessary to make repairs, rehabilitation, or replacements are allowed, provided such changes do not result in disturbance of additional freshwater wetlands or State open waters upon completion of the activity." (Emphasis added).

Appellants and SBB argue the current CDF project is a major, not a minor, deviation from the plan authorized by the 1983 permit. They further assert the current ongoing project is, in fact, disturbing additional freshwater wetlands. The DEP and the DOT disagree.

The DEP's permitting decisions in the record are inadequate in addressing these issues. The DEP declares that the changes are only "minor deviations," but that conclusory statement falls short of the reasoned analysis required to obtain a GP1 under FWPA. The permitting decisions also neither provide any explanation, nor identify any evidence, that "changes in materials or construction techniques" have necessitated the revision and expansion of the CDF.

We do recognize that the GP1 issued by the DEP attaches numerous conditions to minimize the disturbance of additional wetlands, and that the DEP took steps to issue a stern letter to the DOT enforcing those conditions when it learned about acts of non-compliance in spring 2021. Nonetheless, this is yet another aspect of the agency decision that needs renewed attention and amplification on remand.

## IV.

In our discussion in Part III, supra, we have identified several critical issues that require further consideration and reasoned analysis by the DEP. We must remand the case to the agency for that to take place. We do not do so lightly. But there is well-established precedent supporting such a prudent course of action.

Case law has long instructed that as a general principle of sound administrative practice and judicial review, agencies must articulate in their

A-5525-17

final decisions the specific reasons they relied upon in reaching their determinations. "[N]o matter how great a deference the court is obliged to accord the administrative determination which it is being called upon to review, it has no capacity to review at all unless . . . the agency has stated its reasons grounded in [the] record for its action." State v. Atley, 157 N.J. Super. 157, 163 (App. Div. 1978); see also In re FWPA Authorization, 372 N.J. Super. at 594 (invoking this principle in remanding a final agency decision by the DEP for additional analysis and findings). The agency must provide an "expression of [its] reasoning which . . . led to the conclusion below[.]" Lister v. J.B. Eurell Co., 234 N.J. Super. 64, 73 (App. Div. 1989). "We cannot give deference to an agency's factfinding unless we have 'confidence that there has been a careful consideration of the facts in issue and appropriate findings addressing the critical issues in dispute.'" In the Matter of Thomas Orban/Square Props., LLC, 461 N.J. Super. 57, 77 (App. Div. 2019) (quoting Bailey v. Bd. of Review, 339 N.J. Super. 29, 33 (App. Div. 2001)).

Our opinion in In re FWPA Authorization exemplifies the importance of an administrative agency expressly addressing and adjudicating—in the first instance—all of the issues that bear upon the validity of a permit under the

pertinent laws and regulations.  We will discuss that opinion in some depth because of its instructive guidance.

In 2001, a building company applied to the DEP for a FWPA General Permit with plans to construct a road, a cul-de-sac, and numerous single-family homes on freshwater wetlands.  Id. at 580-81.  A prerequisite to obtain such a permit was that the wetlands had to be "isolated," meaning they were not a part of a "surface water tributary system."  Id. at 582-83 (citing N.J.S.A. 13:9B-23(b)).  Many nearby residents opposed the application on the grounds that the wetlands on which the company wanted to build were not isolated, but instead was "hydrologically connected to a swale and ditch system carrying runoff from the site . . . to a nearby stream."  Id. at 584.

After inspecting the property three times, the DEP concluded in a letter of interpretation ("LOI") that the wetlands were isolated, and the application could go forward.  Id. at 586-90.  In response to its LOI, the DEP received additional objections from an array of politicians, environmental groups, and individuals.  Id. at 591-92.  The DEP met with the objectors and discussed their concerns, but ultimately issued the applicant the requested permit on May 2003 without any "findings of fact or analysis of the materials submitted by the objectors."  Id. at 592-93.  The DEP reiterated that the wetlands are isolated,

A-5525-17

permitting construction, but did not respond to any of the specific objections. Id. at 592.

On appeal by the objectors, we held in In re FWPA Authorization that "all . . . FWPA permitting actions require that certain findings first be made by [the] DEP consistent with the applicable statutory criteria[,]" which the DEP did not  issue in that case.  Id. at 595-56.  Our opinion identified numerous deficiencies and omissions from the DEP's findings and analyses.[13]

For those many reasons, we remanded In re FWPA Authorization "for further investigative analysis as may be determined by [the DEP] . . . and for the necessary fact-findings we have held are required." Id. at 598.  We did not retain jurisdiction.  Ibid.  We anticipated that a "subsequent reviewing court,"

---

[13] Among other things, we noted the DEP had not addressed the "abundance of factual material" that could support an outcome contrary to the one it reached. Id. at 596.  For example, the DEP did not sufficiently address that the property creates off-site flows when flooded, which is a characteristic of non-isolated wetlands.  Ibid.  Further, the DEP characterized in a conclusory fashion the off-site flow as a "sheet flow," a term not defined in any corresponding statute or regulation.  Id. at 596-97.  Also, the DEP did not give any explanation or differentiation between this type of flow and one that would make the wetlands sufficiently isolated.  Ibid.  Additionally, the DEP had not inspected the property during a "wet" season, making the court skeptical that the DEP had adequately observed the flow conditions to correctly label the property as isolated.  Id. at 597.  The DEP also relied heavily on a map which it failed to provide to the parties and the court, and it failed to provide analysis of the map and its connection to the property characterization issue.  Ibid.

A-5525-17

if a further appeal were pursued, "could better analyze" the appellants' record deficiency arguments.  Id. at 598.

We follow a similar path here.  The matter is remanded to the DEP to consider, as expeditiously as possible, all of the items we have identified in Part III of this opinion as in need of further consideration.  Upon concluding that review, the Commissioner or his designee shall issue a detailed final agency decision that contains factfinding and reasoned analysis sufficient to enable further appellate review if pursued by the objectors, or by the DOT, or both.  In the course of its review, the DEP should expressly consider the opinions of appellants' expert in the Lee Report on the pertinent topics that have not been disposed of in this opinion, and any material factual developments that have occurred since the Report was issued in 2018.

While the remand is pending, the DEP and the DOT shall retain the discretion to reconsider whether a General Permit is the most appropriate permit for this particular situation or, alternatively, whether the submission by the DOT and consideration by the DEP of an Individual Permit application at this juncture would be more suitable and expeditious.  We provide no advisory opinion on any of these subjects.

67

The remand shall be completed by March 31, 2022, unless the Commissioner advises this court by letter that a reasonable extension of that deadline is imperative, bearing in mind the protracted history of this dispute. In the meantime, we are not persuaded that a stay of the current activity at the project site is warranted. As the parties are well aware, this court has denied a stay pending appeal on multiple occasions during this litigation, and the Supreme Court has not ruled otherwise. As a practical matter, we are aware that, due to habitat cycles and other factors, the dredging and construction activity must stop by December 31, 2021 and cannot resume until July 2022. The status quo need not be changed at this time, pending the outcome of the remand.

All other points raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(D) and (E).

Affirmed in part and remanded in part for further consideration, consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5525-17